UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------x
OBDULIA BATISTA,

              Plaintiff,           **MEMORANDUM AND ORDER**
                                16-CV-3629 (KAM)

    -against-

COMMISSIONER OF SOCIAL SECURITY,

              Defendant.
--------------------------------x
**MATSUMOTO, United States District Judge:**

              Pursuant to 42 U.S.C. § 405(g),[1] Plaintiff Obdulia

Batista ("plaintiff") appeals, *pro se*, the final decision of

Defendant, the Commissioner of Social Security ("defendant" or

the "Commissioner"), which denied plaintiff's application for

Supplemental Security Income benefits under Title XVI of the

Social Security Act (the "Act"). Plaintiff claimed disability

based on cervical stenosis, cervical and lumbar disc

degeneration, and knee problems. (101.[2]) Both parties now seek

judgment on the pleadings under Federal Rule of Civil Procedure

12(c). (ECF Nos. 15, 18.) For the reasons set forth below, both

the plaintiff's and the defendant's motions for judgment on the

pleadings are denied, and the case is remanded under sentence

---

[1] Individuals may seek judicial review in the United States district court
for the judicial district in which they reside of any final decision of
the Commissioner of Social Security rendered after a hearing to which they
were a party, within sixty days after notice of such decision or within
such further time as the Commissioner may allow. *See* 42 U.S.C. § 405(g).

[2] All citations consisting only of page numbers refer to ECF No. 20,
Administrative Transcript, filed July 7, 2017.

four of 42 U.S.C. § 405(g) for further proceedings consistent with this Memorandum and Order.

**BACKGROUND**

**A.   PERSONAL AND EMPLOYMENT BACKGROUND**

Plaintiff was born on December 3, 1972. (45.) She has completed high school and about one year at LaGuardia Community College. (23.) At the time of her disability application, she was 34 years old and lived alone in a boarding house. (79.) She has since moved in with her then 15-year-old daughter in Queens, New York. (21-3.) Plaintiff has not held a full-time job for more than three years. From 1988 to 1990, she worked as a full-time cashier and waitress in a restaurant. (102.) In 1989 and from 1991 until 2003, she did full-time customer service/clerical work in an office. (*Id.*) From 2002 to 2003, she was also self-employed as a hair stylist. (*Id.*) In 2007, she got paid by Great Opinions to participate as part of a focus group. (26-27.)

**B.   MEDICAL BACKGROUND BEFORE APPLYING FOR DISABILITY**

   **1.   Primary Care and Orthopedics at
         the New York Hospital Queens**

Plaintiff uses the New York Hospital Queens ("NYHQ") as her primary treating facility.[3] On March 4, 2005, plaintiff

---

[3]   The NYHQ has produced records spanning eleven years from 2005 to 2014. (201-36, 255-311, 502-1438.) Many of the treatment notes are handwritten and, sometimes, they are difficult to read. Unless noted otherwise, the

presented to the primary care clinic complaining of "arthralgia"[4]

in her right knee. (213.) Her medical history is noted as having

an ovarian cyst and tendonitis, without identifying the location

of the tendonitis, and that she recently went to the ER. (*Id.*)

Her extremities had full range of motion ("ROM"). (*Id.*) On March

10, 2005, the NYHQ conducted an MRI[5] of her right knee, pursuant

to an order by Gary Zagon, M.D., which revealed "a very

small/subtle tear" and a "small amount of joint fluid[,]" but no

"displaced meniscal fragments[.]" (262-63.)

On November 2, 2005, plaintiff returned to the primary

care clinic with pain in her right knee, back of neck, and left

side of her head at a level 5. (216.) She also complained of

pain in her upper back since falling down four steps back in

March or "six months ago[.]" (217.) Her medical history is noted

as having arthralgia, "mild c-spine stenosis", alopecia,[6]

headaches "(migrane/tension type)", "prob. rt knee subtle medial

---

treatment or progress notes are not signed by a doctor or the doctor's
signature is illegible.

[4] "Arthralgia" refers to joint pain. https://medical-
dictionary.thefreedictionary.com/arthralgia (last visited May 12, 2018).

[5] "Magnetic resonance imaging (MRI) is a test that uses powerful magnets,
radio waves, and a computer to make detailed pictures inside your body.
Your doctor can use this test to diagnose you or to see how well you've
responded to treatment. Unlike X-rays and CT scans, an MRI doesn't use
radiation." https://www.webmd.com/a-to-z-guides/what-is-an-mri# (last
visited May 12, 2018).

[6] "Alopecia … means hair loss. When a person has a medical condition called
alopecia areata …, the hair falls out in round patches. The hair can fall
out on the scalp and elsewhere on the body."
https://www.aad.org/public/diseases/hair-and-scalp-problems/alopecia-
areata (last visited May 12, 2018).

meniscus tear", and an ovarian cyst. (*Id.*) Under diagnosis, it is noted that "[a]rthralgias have resolved." (*Id.*) It is also noted that the "x-ray of c-spine-St. Johns was negative." (*Id.*)

On November 18, 2005, plaintiff presented to the orthopedics clinic with right knee pain which she reported having for a year-and-a-half. (219.) The treatment notes state that "[p]revious MRI done earlier this year (March) showed 'a small tear.' Pt. noncompliant w PT. Pt describes a 'sharp dullness' on medial aspect of knee that is intermittent in nature." (*Id.*) There was full ROM in her right knee, no "varus/valgus/cachmans[,]" and no swelling or ecchymosis.[7] (*Id.*) The treatment plan was to take another MRI and determine whether physical therapy or surgery would be needed. (*Id.*)

On October 6, 2006, plaintiff presented to the primary care clinic complaining of frequent urination since she was hit by a car while walking in January 2006. (220.) The doctor noted that she has three herniated[8] cervical discs, two herniated

---

[7]  Ecchymosis is "[t]he passage of blood from ruptured blood vessels into subcutaneous tissue, marked by a purple discoloration of the skin." https://medical-dictionary.thefreedictionary.com/ecchymosis (last visited May 12, 2018).

[8]  "A herniated disk refers to a problem with one of the rubbery cushions (disks) between the individual bones (vertebrae) that stack up to make your spine. A spinal disk is a little like a jelly donut, with a softer center encased within a tougher exterior. Sometimes called a slipped disk or a ruptured disk, a herniated disk occurs when some of the softer 'jelly' pushes out through a tear in the tougher exterior." https://www.mayoclinic.org/diseases-conditions/herniated-disk/symptoms-causes/syc-20354095 (last visited May 12, 2018).

lumbar discs, ovarian cysts, and cervical and spinal stenosis.[9]
(*Id.*) She was taking Vicodin, Celebrex, and Flexeril. (*Id.*) On
November 6, 2006, plaintiff presented again complaining about
frequent urination. (226.) She also complained about pain in
both knees at a level 6 pain intensity caused by "[m]ovement".
(227.) She is still taking Vicodin, Celebrex, and Flexeril.
(226.)

On July 13, 2007, plaintiff returned to the primary
care clinic complaining of pain at a level 9 in her lower back,
neck, and both knees, as well as frequent urination. (229, 231,
515.) Her medical history is consistent with the 2005 and 2006
treatment notes, except arthralgia and alopecia are not listed.
(*Id.*) The doctor recommended a urology consult and physical
therapy, and that cervical stenosis was "mild[.]" (515.) When
plaintiff asked for a private orthopedic referral because her
"meniscal tear" had worsened and needs surgery, the doctor
recommended follow-up with the NYHQ's orthopedic clinic. (*Id.*)
Plaintiff said that she has been "requesting for disability" for
chronic back and knee pain for "many years[.]" (*Id.*) The doctor

---

[9] "[S]tenosis means the abnormal narrowing of a body channel. When combined
with the word spinal, it defines a narrowing of the bone channel occupied
by the spinal nerves or the spinal cord.… The lower back develops lumbar
stenosis, while the neck develops cervical stenosis.… In lumbar stenosis,
the spinal nerve roots in the lower back become compressed and this can
produce symptoms of sciatica—tingling, weakness or numbness that radiates
from the low back and into the buttocks and legs—especially with
activity." https://www.spine-health.com/conditions/spinal-stenosis/what-
spinal-stenosis (last visited May 12, 2018).

prescribed Detrol. (231.)

**2.   David N. Lifschutz, M.D., Neurologist,
      Integrated Neurological Associates, PLLC**

After plaintiff was struck on January 23, 2006, by a
car as a pedestrian, and engaged counsel to institute a personal
injury action (28, 90-91, 93-96), David N. Lifschutz, M.D., a
neurologist at Integrated Neurological Associates, PLLC[10],
treated plaintiff for her injuries. On March 1, 2006, plaintiff
complained to Dr. Lifschutz of:

1. Occipital headaches, intermittent.
2. Neck pain, worse, left greater than right,
   radiating into her left shoulder and down her spine
   described as sharp shooting pains with associated
   neck spasms.
3. Right shoulder pain with some improvement.
4. Right elbow region pain and stinging sensation.
5. Thoracic pain, which she describes as intense and
   debilitating leaving her immobile for hours at a
   time.
6. Lower back pain, worse, radiating down the medial
   right lower extremity.
7. Right hip pain radiating down into her leg.
8. Right knee pain, worse.
9. Right foot/toe pain, on the lateral aspect of the
   big toe.
10. Left lower leg/calf pain, improving.

(161.) The doctor noted that her neck was tender, "[r]ight upper
extremity downward drift and decreased fine finger movements in
the right hand[,]" that her muscle strength is weak in her right

_____
[10]  A portion of plaintiff's bills for being treated by Integrated
      Neurological Associates PLLC from October 3, 2006 to November 21, 2006,
      November 29, 2006, from January 9 to February 5, 2007, were rejected by
      the driver's insurance company. (90, 91, 93-6.)

deltoid and biceps "5-/5", "biceps weakness at 5-/5. Bilateral

hamstring weakness at 4+/5. Bilateral anterior tibialis weakness

at 5-/5 and right iliopsoas weakness at 4+/5." (162.) He further

reported that plaintiff needs a cane to ambulate and has

"limited toe and heel walking[.]" (*Id.*) He also noted that she

has "[d]epressed right biceps jerk and depressed bilateral ankle

jerks." (*Id.*) The doctor also noted tenderness in her cervical,

thoracic, and lumbar spine. (163.) She was limited in her "full

active range of motion[,]" with less than 60% of normal lateral

bending and flexion at 75% of normal range. (*Id.*) She

experienced "pain and increased muscle tone at extreme range of

tolerated movements." (*Id.*) Dr. Lifschutz diagnosed her with:

1. Post-traumatic headache syndrome.
2. Cervical strain, sprain and myofascitis[11] with radicular symptoms; rule out radiculopathy[12] and rule out disc herniation.
3. Right shoulder and elbow sprain.
4. Thoracic sprain and myofascitis.
5. Lumbosacral strain, sprain and myofascitis with radicular symptoms; rule out radiculopathy and rule out disc herniation.
6. Right hip strain.
7. Right knee strain and internal derangement; rule out meniscal tear.
8. Right foot sprain.

---

[11] Myofascitis is "inflammation of a muscle and its fascia." https://medical-dictionary.thefreedictionary.com/myofascitis (last visited May 12, 2018).

[12] "Cervical radiculopathy is the damage or disturbance of nerve function that results if one of the nerve roots near the cervical vertebrae is compressed. Damage to nerve roots in the cervical area can cause pain and the loss of sensation along the nerve's pathway into the arm and hand, depending on where the damaged roots are located." https://www.webmd.com/pain-management/pain-management-cervical-radiculopathy (last visited May 12, 2018).

(164.) The treatment plan included getting MRI scans, physiatry follow up, orthopedic surgery follow up, and continuing to take Vicodin, Mobic, and Robaxin. (165.)

At a follow-up appointment on March 13, 2006 (166-69), the doctor's findings were consistent with those on March 1 (169), except that he also noted that MRIs of her cervical spine on March 2, 2006, revealed "C3-C4 left, lateral herniation narrowing the left neural foramina. Please correlate clinically for C4 nerve root radiculopathy on the left. C5-C6 right lateral herniation narrowing the right neural foramina. Please correlate clinically for CS nerve root radiculopathy on the right. C6-C7 central herniation indenting the thecal sac." (168.) He further noted that an MRI of her lumbar spine on March 10, 2006 showed "LS-Sl central herniation indenting the anterior epidural fat. Ll-L2, L2-L3, and L4-L5 disc bulges indenting the thecal sac." (*Id.*) He also recommended an "EMG/NCS"[13] of her extremities "to clarify clinical suspicion of radiculopathy …." (169.) The March 29, 2006, EMG revealed "a bilateral C5-6 and L5-S1 radiculopathy." (172.)

---

[13] "EMG" refers to "electromyography" which is "[a] diagnostic test that records the electrical activity of muscles" in order to "test for muscle disorders …." https://medical-dictionary.thefreedictionary.com/emg (last visited May 12, 2018). "NCS measures how fast and how strong the electrical activity is in a nerve. The test can tell whether a nerve has been damaged." https://www.webmd.com/brain/emg-and-nerve-conduction-study#1 (last visited May 12, 2018).

On April 26, 2006, plaintiff presented for a follow-up appointment with Dr. Lifschutz. (180.) He noted that the ROM in her spine was between 55 and 80 percent of normal. (*Id.*) Plaintiff complained of "pulling pain" in her spine while "performing lumbar flexion, extension, and lateral flexion." (*Id.*) She also reported that she had hired help to take care of her daughter and assist with household tasks. (177.) The doctor diagnosed her with "joint effusion" in her right knee, and recommended Flexeril and Celebrex. (181, 182.)

On June 7, 2006, plaintiff presented stating that while physical therapy had helped a little with her pain, she is still "in constant pain or discomfort[,]" particularly in her neck and lower back. (183.) She further said that her orthopedist recommended continuing physical therapy. (*Id.*) "[S]he continues to report the following complaints causally related to her MVA on 01/23/06:

1.   Left foot 4th toe shooting pain.
2.   Occipital headaches, intermittent, at times associated with neck pain.
3.   Neck pain and stiffness radiating into her left shoulder and down her spine described as sharp shooting pains with associated neck spasms.
4.   Right shoulder pain still present but not as severe.
5.   Right elbow region pain and stinging sensation still present, intermittent.
6.   Thoracic pain with some improvement since last visit.
7.   Lower back pain, constant, intermittent radiating pain down the right lower extremity.
8.   Right hip pain radiating down into her leg.

9.    Right knee pain persists.
       10.    Urinary frequency.
       11.    Difficulty with daily activities persists; she
              had to hire a helper to help with care of her
              daughter and household chores.

(*Id.*)

        Dr. Lifschutz's examination revealed results similar

to his April 26th examination. There was "[r]ight upper

extremity downward drift and decreased fine finger movements in

the right hand." (185.) He also noted "a little weakness at 5-/5

in the right deltoid and biceps", and "[b]ilateral hamstring

weakness at 5-/5 persists." (*Id.*) He continued to find

"[s]luggish bilateral ankle jerks." (*Id.*) Plaintiff's right knee

was tender to a deep touch and there was right shoulder pain on

touch. (*Id.*) There was also "[t]enderness in the lumbosacral

paraspinal muscles" with some limitations in the ROM. (*Id.*)

There was also "[p]ain and increased muscle tone at extreme

range of tolerated movements." (*Id.*) "Positive bilateral

straight-leg-raise testing at 45 degrees." (*Id.*) The ROM in her

cervical spine ranged from 66 to 80 percent of normal (186),

which was an improvement from 55 to 80 percent during the last

examination. The ROM in the lumbar spine was 75 to 80 percent of

normal (*id.*), same as during the last examination. The doctor

diagnosed plaintiff with:

        1.    Post-traumatic headache syndrome.
        2.    Cervical strain, sprain and myofasciitis with
              radicular signs and symptoms, electrodiagnostic

evidence of bilateral C5-C6 radiculopathy, and
C3-C4 left, lateral herniation narrowing the left
neural foramina, C5-C6 right lateral herniation
narrowing the right neural foramina, and C6-C7
central herniation indenting the thecal sac.
3.   Right shoulder and elbow strain.
4.   Thoracic strain and myofascitis.
5.   Lumbosacral strain, sprain and myofascitis with
radicular signs and symptoms, electrodiagnostic
evidence of bilateral LS-Sl radiculopathy, and
LS-S1 central herniation indenting the· anterior
epidural fat, Ll-L2, L2-L3, and L4-L5 disc
bulges indenting the thecal sac. ·
6.   Right hip strain.
7.   Right knee strain with joint effusion.
8.   Right foot sprain improved.

(187.) He recommended that she continue Vicodin, Flexeril, and

Celebrex, and also prescribed Lyrica for pain. (188.) He also

recommended that she continue with physical therapy, follow-up

with orthopedic surgery and physiatry, ordered an MRI for her

right shoulder, and follow-up with neurology in a few weeks.

(*Id.*) His prognosis was "guarded." (*Id.*)

When plaintiff followed up on July 24, 2006, the ROM

in her cervical spine had improved to between 75 and 80 percent

of normal. (190.) All other findings were the same. (*Id.*) Dr.

Lifschutz's diagnosis and recommended treatment plan was also

consistent with his June 7th notes. (191.) On October 25, 2006,

plaintiff presented for a follow-up appointment. (192-3.) The

treatment notes were generally consistent. He found that

"[p]ain, temperature, and light touch are grossly intact in all

extremities." (192.) The ROM in her cervical spine had improved

to between 75 and 90 percent of normal (*Id.*) He recommended the same treatment plan and medications as during her last visit, except that now he also recommended a Lidoderm patch as needed, Ultram, and Pamelor. (193.) On December 20, 2006, the doctor found that the ROM in her cervical spine was at 77 percent of normal, and in her lumbar spine at 75 percent of normal. (195.) He kept plaintiff on Lidoderm patch, Vicodin, and Flexeril. (194.)

Plaintiff next saw Dr. Lifschutz on April 23, 2007, when there were no significant changes. (176.) She returned on July 23, 2007, for a follow-up appointment. (195-96.) She noted that physical therapy was helping manage her pain. (195.) But she still complained of pain in her lower back, neck, right knee, and left foot. (*Id.*) She reported that "at times has some relief of her lower back pain maybe for a week or two, but then the pain returns, with significant exacerbations lasting often 3-4 weeks. She reports the lower back pain continues to radiate down the right lower extremity." (*Id.*) She also said that an orthopedist diagnosed her with derangement in her right knee. (*Id.*) The doctor found "5/5 muscle strength in all extremities[,]" "some difficulty [with] toe/heel walking" but otherwise a normal gait, and the same ROM in her cervical and lumbar spine, 77 and 75 percent respectively. (*Id.*) He recommended the same medications, Vicodin, Lidoderm patch,

Flexeril, and Celebrex. (196.) He recommended the same treatment plan, except now specified that the physical therapy should focus on the right knee and to consider "more invasive" options if the pain continues after two months; he also recommended "manipulation under anesthesia evaluation and possible treatment" because she "has failed traditional and conservative attempts at treatment for her neck and lumbar spine derangement." (196.)

Also on July 23, 2007, two days before plaintiff applied for disability, Dr. Lifschutz completed a disability evaluation. (242-46.) He diagnosed her with "cervical & lumbar disc degeneration & RT knee internal derangement[.]" (242.) This appears to be consistent with plaintiff's complaints and imaging of the cervical and lumbar spine. He also found plaintiff to be totally disabled for work starting January 23, 2006, "temporarily" until the next appointment. (*Id.*) He restricted plaintiff from heaving lifting, prolonged sitting and standing, repetitive or sustained kneeling, bending, squatting or crawling, physical education or unsupervised exercise at the gym, and operating a vehicle. (*Id.*) Her prognosis was "guarded." (*Id.*) His restrictions, consistent with his treatment notes, are not consistent with a finding of total disability. The record does not show that he ever instructed plaintiff to stop engaging in most daily activities.

### 3. Ronald M. Krinick, M.D., Orthopedist, Seaport Orthopaedic Associates

On May 21, 2007, Ronald Krinick, M.D., an orthopedist at Seaport Orthopaedic Associates, treated plaintiff for pain in her neck, back, and right knee during "light activities." (141-42.) According to Dr. Krinick's notes (141-43), plaintiff reported that on January 23, 2006, she was struck by a car going 25 to 35 miles per hour as she was crossing the street; she was "'carried'" on the hood of the car for 15 to 20 feet and hit the windshield. She was taken to the ER at Jamaica Hospital where x-rays of her neck, back, and right leg "reveal[ed] negative studies[,]" according to plaintiff. (141.) The ER released her after providing her with a prescription, a cane, a cervical collar, and cold compression. (*Id.*) Plaintiff also reported that physical therapy has not improved her ROM, but has improved her muscle strength. (*Id.*) She has also received acupuncture and heat treatment. (*Id.*) Drs. Lifschutz, Levinson, and Manuel have been treating her. (*Id.*) She reported pain between 6 to 7 and sometimes "intolerable." (142.) She also complained of numbness, swelling, tingling, stiffness, and clicking. (*Id.*) She cannot run, carry heavy items, or do excessive walking. (*Id.*) She takes Lidoderm, Vicodin, Flexeril, Celebrex, and Tylenol. (*Id.*)

Dr. Krinick noted that she had no trouble removing her clothes or sitting or lying on the examination table. (*Id.*) Her

"gait was slow." (*Id.*) In her right knee, there was no swelling,

normal sensation at examination, "deep tendon reflexes" were

normal, but "[t]here was visible atrophy at the quadriceps."

(*Id.*) Dr. Krinick's examination of her right knee also showed:

> Range of motion of the right knee reveals:
> extension/flexion - 0/120.° Palpation revealed
> tenderness at the medial joint line. Palpation
> revealed no tenderness at the lateral joint line,
> [p]es bursa,[14] iliotibial band and peripatellar. There
> was evidence of suprapatellar effusion[15], medial gutter
> effusion, lateral gutter effusion and crepitus. There
> was negative Lachman's test, negative anterior drawer
> test, negative pivot-shift test, no varus/valgus
> instability, negative McMurray's test, negative
> compression test, negative inhibition and no
> varus/valgus deformity.

(*Id.*) He also noted that a report of an MRI taken on March 17,

2006, of her right knee stated that there was no tear, but that

he saw a "medial meniscus tear." (143.) He did not specify

whether the tear was a full tear or a small one.

He diagnosed plaintiff with a medial meniscus tear and

traumatic arthropathy,[16] both in the right knee. (*Id.*) "I feel

---

[14] "Pes anserinus bursitis (also referred to as anserine or pes anserine bursitis) is an inflammatory condition of the medial knee." https://emedicine.medscape.com/article/308694-overview (last visited May 12, 2018).

[15] The phrase "joint effusion" refers to swollen joints. https://www.webmd.com/arthritis/swollen-joints-joint-effusion#1 (last visited May 12, 2018).

[16] The phrase "traumatic arthropathy" refers to "[a] joint affected by trauma, characterized by a fracture line through the joint, resulting in hemorrhage, capsular swelling and distension, followed by adhesions between the pannus and synovia, granulation tissue covering the articular cartilage and fibrous ankylosis which may become ossified." https://medical-dictionary.thefreedictionary.com/traumatic+arthropathy (last visited May 12, 2018).

that there is a direct causal relationship between the accident described and the patient's current injuries. The patient's symptoms and clinical findings are consistent with musculoskeletal injuries to the described areas." (*Id.*) The doctor recommended physical therapy three times a week and that plaintiff "consider surgery" and NSAIDs. (*Id.*) "After consideration of various treatment options, . . . a surgical procedure was chosen by the patient for the right knee-arthroscopy." (*Id.*) There is no record of any surgery on plaintiff. The doctor concluded that plaintiff "may work in a light duty capacity[,]" without explaining what he meant by "light duty . . . ." (*Id.*) He recommended that plaintiff return for re-evaluation (*id.*), but this was plaintiff's only treatment by Dr. Krinick.

## C.   **ON JULY 25, 2007, PLAINTIFF APPLIED FOR SSI and DIB**

On July 25, 2007, plaintiff applied for SSI benefits under Title XVI of the SSA, and DIB under Title II of the SSA, claiming that she became disabled on May 1, 2004. (12, 45, 78.) She stated that she is "very limited in walking[,]" cannot run (101), and complained that she can no longer go to the park or go grocery shopping or use the stairs without difficulty. (108-09.) She can only walk for 10 minutes before feeling pain in her back and neck, and has trouble bending her knee. (*Id.*) She does laundry and cooks, but not daily because of her pain. (111.) She

16

can no longer swim or play tennis with her daughter. (112.) She

cannot lift a gallon of water or milk, she stands on one side,

walks with a limp, extending her arms causes pain in her back

and neck, and experiences headaches and ringing in her ears.

(113.) She needs rest after walking two blocks. (114.) She

cannot ride the subway because of the "vigorous motion[.]"

(115.)

## D.  MEDICAL RECORDS AFTER APPLYING FOR DISABILITY

### 1.  The NYHQ Emergency Department

Between October 24, 2007, and October 16, 2013,

plaintiff made 11 visits to the Emergency Department at the NYHQ

("ER"). Each time, the ER discharged her within a few hours,

except on September 13, 2010, when she arrived by ambulance

after passing out. She was admitted to the hospital until

September 16, 2010.

On October 24, 2007, plaintiff presented to the ER

with sciatica,[17] an ankle sprain, "recurrent" lower back pain,

occasional numbness in her right thigh, no weakness, right ankle

pain but no swelling, and "'pain all over'." (1306, 1323, *see

also* 265-76.) She reported "walking a lot" because she has been

looking for a new home. (1323.) The ER noted her history with

---

[17]  Sciatica is a common type of pain affecting the sciatic nerve, a large
nerve extending from the lower back down the back of each leg.
https://www.webmd.com/back-pain/guide/sciatica-symptoms (last visited May
12, 2018).

cervical and lumbar stenosis, car accident a year ago, and that she "was recently weaned of celebrex, flexeril and vicodin x1 mth ago[.]" (*Id.*) Upon examination, the doctor noted full ROM, "[s]ensation intact[,]" everything appeared normal, except "L/S xr c/w possible spondylothesis[18]." (*Id.*) The x-rays taken the same day of her lumbar spine were unremarkable. (857, 1313.) The treatment notes also stated that "LS-Spine x-ray: Interpretation by Emergency Physician, No fx +spodylythesis L5, S1[.]" (1323.) Plaintiff's discharge notes explain that she has "an ankle sprain which is a tearing of the ligaments that hold the joint together. (*Id.*) There were no broken bones seen on the x-ray. Sprains take from 3-6 weeks to heal depending on how severe the injury is." (*Id.*) The ER wrapped plaintiff's ankle and directed her to stay off it. (1320, 1323.) She was discharged with prescriptions for Ibuprofen, Valium[19], and Medrol. (1316-17.) The ER recommended that she follow up with the orthopedics clinic. (*Id.*) The treatment notes also state that she has made "chronic and 365 emergency department visits over the last 365 days. The risk factor is trauma." (1315.)

On September 14, 2009, about two weeks before her

---

[18] Spondylolisthesis is a slipping of vertebra that occurs, in most cases, at the base of the spine. https://www.webmd.com/back-pain/guide/pain-management-spondylolisthesis (last visited May 12, 2018).

[19] The treatment notes do not state why plaintiff had been "weaned" off Vicodin the previous month and why the ER gave her a new prescription for it.

first hearing in front of the Administrative Law Judge ("ALJ"), plaintiff returned to the ER complaining of lower back pain radiating down her left leg, "with paresthesias[20] over the first and second toe[,]" but no weakness. (1294.) The ER noted that Plaintiff has "a history of lumbar and cervical stenosis[, and is] taking ultracet without improvement of symptoms[.]" (*Id.*) Upon examination, everything was normal. (1295.) The ER discharged her the same day with prescriptions for Valium, Percocet, and Toradol (NSAID painkiller). (*Id.*)

On December 10, 2009, plaintiff presented to the ER with gradual pain on the right side of her chest that had onset the prior day, fever, "pleuntic pain[.]" (1277, 1282.) The pain ranged from moderate to maximum pain, although at the moment just mild pain, aggravated by breathing and coughing, no prior episodes. (1282.) The ER ordered a chest x-ray which presented normal. (767, 1276.) Upon examination, everything was normal with her heart, respiratory, chest wall, extremities, and abdomen. (1283.) The ER discharged her the same day with Ibuprofen. (1275.) They directed her to rest at home, take prescribed medications as instructed, and follow-up with ambulatory care doctor. (1280.)

---

[20] The term "paresthesia" refers to "an abnormal sensation of the skin, such as numbness, tingling, pricking, burning, or creeping on the skin that has no objective cause." Definition of Paresthesia, MedicineNet.com, http://www.medterms.com/script/main/art.asp?articlekey=4780 (last visited May 12, 2018).

On September 9, 2010, about a year later, Plaintiff returned to the ER for pain on the right side of her back for a week that was radiating to her right hip, which pain worsened with movement. (1254, 1264.) Upon examination, her back and extremities had normal ROM, and her gait and motor strength were normal. (1265, 1266.) The ER discharged her the same day with Ibuprofen and a prescription for Cyclobenzaprine (Flexeril) (1255, 1257), as well as a list of musculoskeletal referrals. (1261-62.)

But four days later, on September 13, 2010, an ambulance brought plaintiff back to the ER after she fainted. (1114, 1138.) She fainted from severe back pain that arose after she went on roller coasters and bumper cars at an amusement park. (628, 1130.) The examining doctor found "full rom with pain limitation[,]" and noted that she "is A&O, NAD, but appears uncomfortable." (1130, 1131.) She had not filled the prescriptions that she had received on September 9th. (1130, 1171.) While at the hospital, plaintiff took Acetaminophen, Diazepam, Ketorolac, and Baclofen. (1122-24.) On September 13th, the ER ordered chest and pelvic x-rays, all of which showed no abnormalities. (772, 1126-27.) The x-rays that same day of her lumbar spine did show "straightening of the lumbar spine which can be consistent with patient history of pain." (773, 1128.) On September 15, 2010, the hospital ordered an MRI of her lumbar

spine and found "discogenic degenerative disease at L3-4, L4-5 and L5-S1." (735, 770.) In comparison to an MRI of her lumbar spine on February 14, 2008, the finding was

> INTERVAL INCREASE IN RIGHT ECCENTRIC DISC BULGING AT
> L3-4 WITH MILD CENTRAL CANAL STENOSIS AND MILD TO
> MODERATE BILATERAL FORAMINAL STENOSIS. STABLE DISC
> BULGE AT L4-5 WITH MILD CENTRAL CANAL STENOSIS AND
> NARROWING OF THE LATERAL RECESS AS WELL AS MODERATE
> BILATERAL FORAMINAL STENOSIS WITH CONTACT OF BULGE AND
> EXITING NERVE ROOTS.

(771.) On September 16, 2010, the doctor recommended that she continue to take Baclofen, Percocet, and Morphine, and get a physical therapy evaluation. (1179.) The notes also state that Dr. Gibbs was contacted that day for a neurosurgery consult, "NSAIDs, muscle relaxant, and higher dose long acting narcotic[.]" (*Id.*) Upon discharge on September 16th, the doctor also prescribed MS contin and Meclizine. (1149.)

On November 2, 2011, plaintiff presented to the ER for pelvic pain. (1102, 1108.) On March 14, 2012, plaintiff presented again for pelvic pain after a pap smear the prior week. (1109.) The doctor prescribed Ibuprofen, Flexeril, and Baclofen. On Tuesday, April 24, 2012, plaintiff presented with episodic neck and back pain radiating down to her right leg which worsened after cleaning her house the prior Sunday. (1075, 1080, 1082.) Upon examination, she was not in distress, had full ROM in her extremities, "non-tender back[,]" and normal gait, motor and sensation. (1080.) The ER discharged her the same day with

Acetaminophen, after she was administered a Ketorolac (Toradol) injection. (1084.) On June 12, 2012, plaintiff returned for abdominal pain. (1042.) She had no other issues, no numbness or tingling, and was alert and oriented. (1049.) She had full ROM in all joints. (1050.) A CT scan of the abdomen and pelvis was normal. (915.) The ER discharged her without any medications, noting that she was currently taking Flexeril. (1051.) It appears that on October 16, 2012, the ER ordered x-rays of plaintiff's right wrist which showed "an occult non displaced fracture cannot entirely be excluded" and recommended an MRI for further evaluation. (918.)

On June 18, 2013, plaintiff presented to the ER for numbness and tingling in her left hand, back pain, and numbness in her leg or toes. (997, 1003.) The doctor ordered MRIs of the cervical, thoracic, and lumbar spine. (1006.) There was no significant change in the results from the September 15, 2010, MRI of her lumbar spine and the December 11, 2009 MRI of her cervical spine. (1006-09.) The radiologist noted that there was no "cord compression" in the cervical spine, that at "3-C4, … there is mild left foraminal stenosis secondary to uncovertebral degenerative change," at "C4-5 [there is a] mild disc bulge[,]" that "at C5-C6, there is a broad based disc osteophyfe complex with mild flattening of the ventral cord surface there is mild central canal stenosis there is mild right foraminal stenosis

secondary to uncovertebral degenerative change[,]" and "at C6-C7, there is a broad based disc osteophyte complex without contacting the cord[.]" (1006-7.) The radiologist noted "minimal degenerative disc disease in the thoracic spine" without any herniation or stenosis. (1007.) In the lumbar spine, the radiologist noted that at L3-4 there is "right eccentric disease bulge and facet degenerative change[,] . . . mild central canal stenosis[,] . . . mild bilateral foraminal stenosis[.]" (*Id.*) At L5-S1, the radiologist noted "facet degenerative change[.]" (*Id.*) The radiologist also noted that at L4-L5, "there is a diffuse disc bulge and facet degenerative change[,] . . . mild central canal stenosis[,] . . . mild bilateral foraminal stenosis." (*Id.*) Upon examination, the doctor noted full ROM in all joints with no pain, and motor strength 5/5. (1015, 1018.) She was discharged the same day. (1020.)

On October 10, 2013, plaintiff presented with pain in her hand after she sprained it the prior month. (1023, 1028, 1032.) A week later, on October 16, 2013, plaintiff returned for pain in her back and right shoulder and weakness. (983.) She complained of pain in moving her neck and right shoulder at a level 5, that the symptoms arise three to four times a year, usually resolve within seven to 10 days on their own, but "this time worse than usual[,] and that the pain arose "while on hands and knees cleaning floor[.]" (988, 989.) She was taking

Ibuprofen, Diazepam, Oxycodone, Esomeprazole, and Flexeril.
(991-92.) The doctor diagnosed her with "cervical radicular
pain." (984.) The ER discharged her the same day with Ibuprofen
and a prescription for Diazepam. (983, 987.) Plaintiff returned
about two weeks later, on October 29, 2013, for shoulder and
back pain. (960.) She also reported waiting for insurance
approval for an EMG. (971.) A physician's assistant administered
a Ketorolac injection. (965.) Upon examination, plaintiff could
move all her extremities and denied weakness. (969, 971.) The ER
discharged her the same day. (972.)

### 2. Ji H. Han, M.D., Queens Medical Associates

On February 21, 2008, plaintiff presented to Ji H.
Han, M.D., at Queens Medical Associates for pain management upon
referral from Dr. Renuka Shetty Das from the NYHQ. (259.) Dr.
Han noted that plaintiff complained about lower back pain for
about a year that was getting worse after being hit by a car in
January 2006. (*Id.*) Plaintiff also complained of pain radiating
down to her hips and right leg, neck pain, and bilateral arm
numbness and tingling. (*Id.*) Physical therapy and acupuncture
had provided only "minimal relief . . . ." (*Id.*) She complained
of not being able to work or sleep because of the pain. (*Id.*)
Plaintiff further told the doctor that she had also taken
Vicodin (1ast 2 months ago) and Celebrex (last taken Sep 2007),
also "with minimal relief[.]" (*Id.*) Currently, plaintiff was

24

taking Flexeril with "minimal relief[.]" (*Id.*) A week later, on February 28, 2008, plaintiff returned to Dr. Han presenting with the same complaints, except now pain was radiating from her back to her right shoulder blade, both her hips, and right leg. (*Id.*) Again, she reported that Flexeril and physical therapy provided little relief. (*Id.*) She could not tolerate the drowsiness after taking Neurontin so she stopped taking it. (*Id.*)

Dr. Han found that the ROM in her lumbar spine flexion was at 70 degrees of 90, and extension was at 20 degrees of 30, and full ROM in lateral flexion and rotation bilaterally. (259-60.) The doctor also found that her lumbar spine was tender to the touch. (260.) All other tests were negative-Lesique, Bowstring, Patrick and Sciatic Notch. (*Id.*) Muscle strength in her lower extremities was noted at 5/5. (*Id.*) Dr. Han diagnosed plaintiff with lumbar and cervical radiculopathy, spondylosis in the lumbar, without myelopathy, and cervical spondylosis. (260.) Dr. Han recommended an epidural steroid injection for the L5/S1, scheduling in the future lumbar facet injection, decreasing her Neurontin dosage, and continuing with Flexeril. (*Id.*)

### 3. Primary Care and Orthopedics at the NYHQ

Between July 25, 2007, the day of her disability applications, and 2014, plaintiff presented to the primary care and orthopedics clinics at the NYHQ a few times a year with fairly similar complaints of pain in her back, knee, and or

neck, and occasionally of pain radiating down to her legs or pain in her chest. She complained that the pain interfered with her sleep, kept her from securing a full-time job, caused her on three occasions to lose her balance, and worsened with movement. Doctors continuously referred her for physical therapy. She was compliant only sporadically with physical therapy and sometimes reported that it helped with the pain and other times reported that it did not help in alleviating her pain.

On July 25, 2007, plaintiff presented to the orthopedics clinic complaining of pain in her right knee resulting from a car accident. (516.) The doctor noted that that she has a "slightly antalgic gait[,]" that arthroscope was recommended, that the last MRI in May 2006 showed a "questionable medial meniscal tear[,]" and ordered another MRI. (516-17.)

On August 1, 2007, an MRI of her right knee found "no meniscal or ligamentous tears[,]" but rather a "tiny joint effusion[.]" (854-55.) On August 31, 2007, plaintiff returned to the orthopedics clinic with worsening pain in her right knee. (518.) Plaintiff complained of right medial knee pain for three weeks and right "groin pain that radiates to" her right knee. (*Id.*) She stated that had the knee pain before the car accident and was "told by an outside orthopedics group that the accident aggravated med. meniscus tear. Pt. wanted to have surgery w NYHQ

so had MRI here." (*Id.*) She reported taking Motrin, Valium, and Mederil since her ER visit for groin pain. (*Id.*) Examination revealed positive for "clicking" but not "knee sticking/locking[.]" (*Id.*) The doctor also found 4/5 for "knee strength flexion/extension[.]" (519.) The doctor noted the results of the last MRI, recommended physical therapy for the right knee for six weeks, lower back "workup[,]" and follow-up in two months. (*Id.*) On October 24, 2007, x-rays of her lumbar spine found "normal alignment[,]" "[n]o evidence of fracture[,]" and that "[t]he sacroiliac joints appear within normal limits." (264.)

On January 3, 2008, plaintiff presented to the primary care clinic with severe back pain. (520, 521.) Plaintiff reported back and neck pain that vary between levels 2 and 8, taking Motrin, and that "nonpharmacological modalities & NSAID" have not resulted in any "significant improvement[.]" (521.) The doctor noted the car accident in 2006, "mild cervical stenosis[,]" and "chronic back pain/hx herniated discs." (*Id.*) She also reported that it was previously recommended that she see a spine surgeon, but she had insurance issues. (*Id.*) The doctor recommended physical therapy, scheduled her for a spine surgeon evaluation, referred her for a pain management consult, recommended continuing with NSAIDs, and prescribed Flexeril. (522.) There is no mention of Valium or Mederil, which she was

taking on August 1, 2007.

An MRI taken on February 14, 2008, of her lumbar spine showed "slight disc desiccation and bulge at L4-L5 with mild canal stenosis[,]" and "mild disc bulge at L5-S1 without stenosis." (261.) On October 7, 2008, plaintiff presented to the primary care clinic with the same complaints, now also complaining of occasional chest pain, and that the pain in her back was radiating down to her legs, more recently to her left foot, and, consequently, she loses her balance and falls. (537.) The pain worsens when she walks, stands, or engages in any activity, and gets better when she lies down. (*Id.*) The doctor noted that she has been evaluated by a neurologist and orthopedist. (*Id.*) A physical examination showed that her back was not tender to touch, she has difficulty walking, she feels pain when straight leg raising ("SLR") greater than 45 degrees, and motor strength was 5/5. (*Id.*) She was still taking Flexoril and using the Lidoderm patch, and had started Toradol (Ketorolac)(NSAID for short-term pain relief); Neurontin not listed. (*Id.*) The doctor recommended physical therapy, prescribed Baclofen in place of Flexaril, and Ultracet, continued use of the Lidoderm patch, an EKG for the chest pain, and addressed her gynecological issues. (539, 543.) On the same day, an upper GI series showed reflux. (860.) On October 20, 2008, an upper GI series of her esophagus and stomach showed no

issues other than "moderate" reflux. (549-50.) On December 10, 2008, plaintiff presented with frequent urination issues. (546.) Her only medication listed was the Lidoderm patch. (*Id.*) It was recommended that she try Detrol again, even though plaintiff said that it had not resolved her problem previously. (*Id.*) She was also given a referral for a neurological consult. (*Id.*)

On January 8, 2009, x-rays of her cervical and lumbar spine, as well as of her pelvis, revealed "no significant abnormality". (869-71.) On January 22, 2009, plaintiff presented with neck pain at a level 7, right ankle pain at a level 10 (559), and bilateral arm numbness. (561.) The doctor recommended that she continue her prior medications-Ultracet, the Lidoderm patch, and Baclofen. (560, 562.) The doctor also recommended physical therapy and consults with an orthopedist and spine specialist. (562.) On June 8, 2009, x-rays of her pelvis and cervical lumbar spine showed no "significant abnormalit[ies]." (794-95, 870.) An ultrasound on July 3, 2009, of her bladder was normal. (874.) On July 23, 2009, she returned to the primary care clinic for a follow-up appointment and physical therapy referral. (566.) She complained of sharp pain at a level 6 on the left side of her ribs for about three weeks that would last a few minutes and resolve quickly. (*Id.*) For the past two days, she was experiencing dull pain at a level 5 "radiating from [her left] shoulder to forearm dull." (*Id.*) She stopped taking

Arthrotec because of nausea. (*Id.*) She has not engaged in any strenuous activities, no numbness or tingling. (*Id.*) The doctor instructed her to continue the Lidoderm patch, restart Baclofen, continue Ultracet/Arthrotec unless nausea persists, provided a physical therapy referral, and instructed to follow-up with orthopedics. (*Id.*)

On September 24, 2009, imaging showed a "simple cyst" in her right breast requiring no further evaluation. (875.) On October 2, 2009, x-rays of her lumbar spine showed "focus of increased attenuation overlying the left renal shadow could represent renal calculi otherwise unremarkable[.]" (877.) On December 11, 2009, an MRI of her cervical spine showed "straightening of the cervical lordosis[,][21] mild left foraminal stenosis at the c3-4 level from osteophytes[,][22] small central disc herniation at the c5-6 level with minimal anterior cord[.] . . . there is also moderate right foraminal stenosis from osteophytes[.]" (880.)

On December 18, 2009, plaintiff complained of eight days of a dry cough, a fever of 100.8 degrees, chills for a night, and soreness in her abdomen, back, and neck from

---

[21] Lordosis is the natural curve in the neck. Straightening means losing some of the natural curve in the neck. https://www.clear-institute.org/blog/cervical-lordosis/ (last visited May 12, 2018).

[22] Osteophytes refer to bone spurs. https://medical-dictionary.thefreedictionary.com/osteophyte (last visited May 12, 2018).

"extensive coughing[.] . . . CXR 12/10/09: lungs appear clear[.]" (587.) She is taking Vicodin and Arthrotec; the Lidoderm patch and Baclofen are not listed. (587, 591.) The doctor prescribed "Guaifenesin/Codien" and instructed plaintiff to continue her other medications. (589.)

On January 7, 2010, plaintiff presented to the primary care clinic for persistent dry cough, intermittent and sharp chest pains for the past three weeks, and numbness in the upper extremities. (593, 598.) She asked for another doctor referral due to a change in her insurance. (593, 597.) Plaintiff's insurance did not cover a prior prescription for codeine. (597.) She finished a round of Zithromax the prior week. (*Id.*) Her cough had improved, but it would worsen as it got colder. (*Id.*) The doctor's notes on her medical conditions are consistent with the previous treatment notes, and now included GERD[23] and a "simple cyst" in her right breast. (*Id.*) She does not have a fever, chills, or abdomen pain. (*Id.*) The doctor did not refill her prescriptions for Guaifenesin and Vicodin, she had stopped taking Arthrotec, the doctor instructed her to continue the Lidoderm patch as needed, prescribed her Zyrtex, Mobic, Baclofen, Ventolin, Nexium, and gave her a prescription for a

---

[23] "Gastroesophageal reflux disease, or GERD, is a digestive disorder that affects the lower esophageal sphincter (LES), the ring of muscle between the esophagus and stomach." https://www.webmd.com/heartburn-gerd/guide/reflux-disease-gerd-1#1 (last visited May 12, 2018).

cervical collar, and an orthopedic referral for her spine. (594, 596, 598.) The doctor also noted the results of the December 9, 2009, MRI of her cervical spine. (*Id.*)

On May 21, 2010, plaintiff presented complaining of "occipital" headaches[24] since March that are the same severity and frequency, and "dysphagia" that onset a few days earlier. (600.) Plaintiff also said that her back pain has improved, and denied taking any medication for it. (*Id.*) The doctor noted that her March 5th mammogram was clear, that the December 2009 MRI of her cervical spine revealed "straightening of cervical lordosis[,]" and that another MRI revealed "foraminal stenosis at C3-4 level from osteophytes" (*id.*), "small central disc herniation at C5-6 w/ minimal ant. cord flattening[,] . . . [and] moderate [right] foraminal stenosis from osteophytes." (605.) The doctor diagnosed that the cervical stenosis was causing the occipital headaches, referred her for a neurology consult and physical therapy, and noted that the dysphagia "is most likely viral[.]" (*Id.*) The doctor prescribed Motrin and Zithromax, instructed her to continue taking her current medications, which are not listed. (602, 605.) Plaintiff refused

---

[24] "Occipital neuralgia is a condition in which the nerves that run from the top of the spinal cord up through the scalp, called the occipital nerves, are inflamed or injured. You might feel pain in the back of your head or the base of your skull. People can confuse it with a migraine or other types of headache, because the symptoms can be similar." https://www.webmd.com/migraines-headaches/occipital-neuralgia-symptoms-causes-treatments#1 (last visited May 12, 2018).

prescriptions for pain medications, and asked for a trial of
Nexium for possible GERD. (605.)

On August 3, 2010, plaintiff presented to primary care
complaining of abdomen pain on her left side at a level 8.
(616.) She reported that her chronic back pain was improving.
(620.) The doctor encouraged her to consider a trial of Nexium
for her reflux for which "history and symptoms are non-
specific[.]" (621.) Plaintiff returned on September 20, 2010,
for a follow-up appointment after being admitted from the ER on
September 13th for fainting at home due to pain in her right
lower back and hip after riding in roller coasters and bumper
cars at an amusement park. (623, 628.) Dr. Lee noted the results
of her MRIs of her cervical and lumbar spines, that she was
discharged after her hospitalization with Percocet, Naproxen,
Medizine, Baclofen, and Ms Contin. (623.) Plaintiff reported
that her pain was "well controlled on current pain
medications[.]" (*Id.*) The doctor prescribed Colace and Senokot,
and instructed her to continue her other medications including
Nexium. (624, 626.) On December 21, 2010, plaintiff returned for
a follow-up appointment and renewal of her prescriptions. (628.)
Her pain was between 3 and 8 and "usually radiates down right
leg & now recently down left leg[.]" (*Id.*) The doctor noted that
the pain in her left leg is likely from overcompensating her
posture of pain from the right leg. (*Id.*) The doctor noted that

she is a full-time student. (*Id.*) Plaintiff reported that her pain is "well controlled" with medication. (633.) The doctor prescribed multivitamins, and refills for Nexium, Colace, Baclofen, Meclizine, Naproxen, and Percocet, and is instructed to discontinue MS Contin. (630, 632, 633.) Her physical therapy referral was renewed and plaintiff was instructed to follow up for pain management. (633.)

On May 6, 2011, plaintiff returned to the primary care clinic with "worsening low back pain[,]" at a level 6. (634-35.) She has seen a neurologist and was not a candidate for surgery. (634.) The doctor also notes that she was "poorly compliant" with physical therapy and failed to follow-up, that all her sensations are intact, that she had no weakness, can walk on her heels and toes, and had no trouble transferring from chair to examining table. (*Id.*) The doctor instructed her to follow-up with pain management to determine whether an injection or a "spinal stimulator" would be recommended. (639.) The doctor prescribed Ergocalciferol and renewed her prescriptions for Baclofen, Nexium, and Naprosyn. (636, 638.) Colace and Meclizine were not on her list of medications. (638.) On May 27, 2011, she presented with lower back pain at a level 4. (641.) She complained of seven days of intermittent back spasm/tingling about five days ago, but experienced no weakness or pain while walking. (640.) Upon examination, her back was not tender and

34

there was no ecchymosis. (*Id.*) Other than prescribing her Vitamin B12, there was no change in her medications. (642, 644.) The doctor prescribed Baclofen again and instructed to continue with Naproxen, Nexium, and Vitamin D. (642, 644.)

On April 8, 2013, Opeyeml Oladele, M.D. treated plaintiff. (683-84.) The doctor noted that the MRI of her lumbar spine on February 25th showed "no significant change compared to prior study; no acute vertebral body compression fx[.]" (683.) The physical exam revealed pain in her left leg, otherwise normal. (*Id.*) The doctor prescribed Flexeril, and instructed her to continue her other medications (684; 1339.) On July 22, 2013, Svetlana Fuzaylova, M.D. treated plaintiff, who presented with pelvic pain, neck pain at level 8, numbness, and tingling. (1415-17.) Plaintiff was taking Naproxen and Flexeril. (1415.) Upon examination, the doctor found "decreased range of motion of cervical spine limited to left[, and] diminished patellar reflexes[.]" (1416.) The doctor prescribed Gabapentin and refilled the Naproxen prescription. (*Id.*)

On November 7, 2013, Yong Kim, M.D., an orthopedist, treated plaintiff. (1409-10.) After a physical examination, the doctor diagnosed plaintiff with cervical neuritis and left shoulder pain. (1410.) The doctor referred plaintiff to orthopedists Dr. Hu and Dr. Quach. (*Id.*) Dr. Kim also prescribed Ultracet and instructed plaintiff to "[a]void aggravating . . .

, . . . strenuous . . . , [and] high impact activities." (1410.)
On May 19, 2014, plaintiff presented to Fiona Connolly, DPM,
following up on a toe injury. (1365.)

Below is a summary of the treatment notes of
specialists at the NYHQ who treated plaintiff more than once.

### a. Richard Gasalberti, MD, FAAPMR, Physical Medicine and Rehabilitation

Richard Gasalberti, MD, FAAPMR, treated plaintiff four
times between June 14, 2011, and July 9, 2013. On June 14, 2011,
he conducted a new patient evaluation. (647.) He described
plaintiff as "a 38-year-old female with a chief complaint of
back pain." (*Id.*) He noted that she had a car accident in 1996
(*id.*), but all other record evidence notes that the accident
occurred in 2006. The doctor also noted that she hurt her neck
and back in this accident (*id.*), but there was no evidence that
clearly made that causal connection. The doctor also stated that
plaintiff "was pain-free up until April of 2010" (*id.*), but the
record evidence indicated that she complained even before the
accident in 2006. Dr. Gasalberti further noted that

> [s]he has chronic pain and discomfort in her neck and
> back. On a pain scale of 1-10, 10 being the worst, the
> patient feels approximately an 7½. She is taking
> baclofen, naproxen and Nexium. Her primary care doctor
> is giving her medications.
>
> She denies headaches, blurred vision, or difficulty
> swallowing. She denies bowel/bladder dysfunction. She
> has stiffness and pain in the lower back. She reports
> numbness and tingling in the left hand. She denies any

36

radicular symptoms in the lower back area.

The patient is followed by her primary care doctor who
has given her vitamins. Otherwise, her blood work is
within normal limits.

(*Id.*) He also notes that she is currently a student who lives

"independent[ly]" and engages in daily activities. (*Id.*) Dr.

Gasalberti also noted that plaintiff weighed 158 pounds and was

five feet three inches tall. (*Id.*) Upon examination,

she has pain with trunk flexion of 0-60 degrees[25] and
lateral rotation is 0-5 degrees. Straight leg raising
is positive on the left 0-40 degrees and on the right
0-60 degrees. There is a functional range of motion of
both hips, knees, and ankles. Pulses are intact.
Sensory testing is intact to pinprick and light touch.
Manual muscle testing of both lower extremities is
5/5. Deep tendon reflexes are noted to be symmetrical.
Deep palpation revealed lumbar paraspinal spasms at
the left L4-5 and L5-S1 level.

(648.) His examination also showed that

[c]ervical motion to the right 0-70 degrees, left 0-70
degrees, flexion and extension 0-35 degrees. Deep
palpation revealed paracervical spasms at the C5-6
level. There is Tinel's[26] at both wrists.

(651.) He also found that sensation was intact, functional ROM

in upper extremities, and that muscle testing of upper

---

[25] Trunk flexion refers to bending forward with a range of 0 to
https://www.thefreedictionary.com/flexion (last visited May 12, 2018).

[26] "Tinel's sign: The sign that a nerve is irritated. Tinel's sign is positive
when lightly banging (percussing) over the nerve elicits a sensation of
tingling, or 'pins and needles,' in the distribution of the nerve. For
example, in carpal tunnel syndrome, where the median nerve is compressed
at the wrist, the test for Tinel's sign is often positive, eliciting
tingling in the thumb, index, and middle fingers."
https://www.medicinenet.com/script/main/art.asp?articlekey=16687 (last
visited May 12, 2018).

extremities was 5/5. (*Id.*)

Dr. Gasalberti diagnosed plaintiff with "chronic cervical and lumbar pain," and noted to "rule out left C5-6 and C6-7 radiculopathy," and "L4- 5 radiculopathy," and "traumatic cervical/lumbar myofascial pain syndrome." (*Id.*) He recommended another MRI "of the cervical and lumbar spine to rule out herniated nucleus pulposus."[27] (*Id.*) He also provided her with a "cervical pillow and lumbosacral corset for comfort and support[,]" and prescribed Voltaren gel. (*Id.*) He noted that the goal is independent living. (*Id.*) He instructed her to return when his workup is completed. (*Id.*)

On May 8, 2012, Plaintiff returned to Dr. Gasalberti and he conducted another new patient evaluation. (665-67.) He noted that she presented with worsening back pain that she has had for the past five years. (665.) She further presented with "radicular symptoms in the right lower leg. She was recently seen in the emergency room and given Vicodin. She has had no recent workup. She is presently not working.  Pain is worse with activities and relieved with rest. . . . She has had mild cervical spine stenosis and small central disc herniation as noted from previous records. MRI of the lumbar spine from 2010 revealed disc bulging at the L3-4 level." (*Id.*) As he did in

---

[27] It is unclear whether Dr. Gasalberti did not review the prior MRIs of her cervical and lumbar spine or whether he wanted to determine if there was a change since her last MRIs were conduct.

2011, Dr. Gasalberti again he noted that she is a student. (*Id.*) The review of her systems was normal. (Id.) His examination results were similar to the prior year. (666.) As in 2011, the doctor recommended an MRI of the lumbar spine to rule out herniated discs. (667.) He also recommended x-rays of the "SI joint to rule out bony pathology[,]" and an EMG "of the lower extremities to electrophysiologically document for lumbar radiculopathy[.]" He prescribed Flexeril and Mobic and wanted a return visit in one week. (*Id.*) There is no record of EMG results dated 2012. The same day, a radiologist presented x-ray results to Dr. Gasalberti showing normal results for plaintiff's lumbar spine. (710, 910.)

Plaintiff presented to Dr. Gasalberti a year later, on June 18, 2013, with lower back pain, "associated numbness progressive in nature. Pt indicates pain is currently at 8/10" (1424-25.) He noted her medical history as "[c]hronic lumbar pain 2/2[,] spinal stenosis and L3-L4, L4-L5 disk herniation, [l]eft ovarian cyst, uterine fibroids, Vitamin B12 deficiency, Vitamin D deficiency, GERD, [h]and sprain (resolved 05/20/2013)." (1424.) In addition to Aleve, she takes Naproxen and Flexeril. (*Id.*) Upon examination, he found the ROM in her neck and shoulder joint to be "normal[,]" that her reflexes were "2 plus bilaterally[,]" but that the sensation at C7-C8 was "diminished[,]" that her motor strength was "diminished[,]" that

39

there was no tenderness along her back, but that she had "paraspinal muscle spasm" on the right side, and less of that but still present on the left side of her neck, "+ spurlings." (*Id.*) On her "Lumbar Spine/Lower back[,]" he found "pain with range of motion to extremes[,]" that her gait was antalgic, but "normal curvature of spine[,]" and "EHI/FHI/TA/gS 4-/5 Right> left, LE reflexes intact, + straight leg to right, Nontender to palpation to I-spine." (*Id.*) He diagnosed her with lumbar and cervical radicular pain. (*Id.*) The doctor ordered an MRI of her c-spine and L-spine, sent plaintiff to the ER without explaining why, instructed her to return to Dr. Hu in a week if the imaging results are "benign[,]" but would see her if symptoms and imaging "indicate aggressive changes[.]" (1425.)

On July 9, 2013, Dr. Gasalberti signed a Medicaid Transportation Justification Request for plaintiff to use a car service because she has "severe symptoms of lumbar radiculopathy" and checked off the box indicating that plaintiff could walk and grab a vehicle unassisted, but could not use the subway or buses. (1326.) This was a "long term" request. (*Id.*) The doctor also examined plaintiff that day. (1421.) He reviewed the results of the June 18, 2013 MRIs taken of her cervical, thoracic, and lumbar (lower back) spine at the ER. (1421-22.) His diagnosis was the same as on June 18th, cervical and lumbar radicular pain. (1423.) He prescribed Flexeril and recommended

physical therapy. (*Id.*) He continued to order an EMG of her upper and lower extremities, and recommended considering a joint injection in the future. (*Id.*) There is an EMG/NCS intake form filled out for plaintiff that is dated November 14, 2013, indicating referral from Dr. Gasalberti. (1336.)

### b. **Brian Son, D.O., Osteopathic Medicine**

Brian Son, D.O. treated plaintiff twice. On September 16, 2011, plaintiff presented to Dr. Son with historical pain in her head and chest, but not at the present time. (652-53.) To the extent legible, the handwritten notes indicate that plaintiff complained of intermittent chest pain that is left-sided and occasionally radiates to her back, and that two months earlier she chose not refill her prescriptions and stopped all her medications. (654.) Dr. Son found her positive only for headaches. (*Id.*) Upon examination, her neck, respiratory system, chest, abdomen, muscoskeletal, and extremities were normal. (*Id.*) The doctor recommended cardiology and neurology consults, physical therapy for her neck and lower back, prescribed refills for Baclofen and Naproxen for back pain, Nexium for GERD, multivitamins, and returning for a follow-up in two months. (655.) Plaintiff failed to go to for her October 2011 cardiology consult. (657.)

On March 23, 2012, Dr. Son treated plaintiff again for chronic back and abdomen pain. (663.) Plaintiff reported not

taking any medications since December 2011. (*Id.*) Upon

examination, Dr. Son found that plaintiff's abdomen was tender

to deep touch, motor strength was 5/5, and there was tenderness

at L2-L4. (*Id.*) He recommended a consult with the

orthopedic/spine clinic and neurology, prescribed Baclofen and

multivitamins, which he also prescribed on her last visit, also

recommended Pepcid, and instructed her to continue with her

other medications. (661, 664.)

### c. Reza R. Zarnegar, M.D., Neurologist and Osteopathic Medicine

Reza Zarnegar, D.O. treated plaintiff twice. On July

19, 2010, plaintiff presented to Dr. Zarnegar with chronic

headaches that began around "the time school started[,]"

numbness in her legs and arms for about three years, neck pain

that radiates to her right shoulder and has been worsening.

(608.) Plaintiff was noted to be a student at LaGuardia

community college. (*Id.*) On examination, the doctor found

sensory and coordination intact, noted the results of the 2009

MRI of her cervical and lumbar spine, noted that a 2004 MRI of

her brain was unremarkable, that a report of a February 2010 EMG

was unavailable (*Id.*) Dr. Zarnegar diagnosed plaintiff with

chronic headaches in the posterior head region, may be of

"cervicogenic origin[.]" (*Id.*) The doctor recommended NSAIDs and

physical therapy, noted that plaintiff is "[n]ot interested in

more aggressive measures[,]" recommended trying Percocet as needed, and returning in two months. (*Id.*)

On October 24, 2013, Dr. Zarnegar treated plaintiff at her follow-up appointment. (1411.) Plaintiff was taking Naproxen and Gabapentin. (*Id.*) Plaintiff's diagnosis was "[c]ervical (neck) region somatic dysfunction" and left shoulder pain. (*Id.*) The doctor ordered an EMG of her cervical spine, prescribed Flexeril, and recommended follow-up with Dr. Gasalberti after the EMG. (*Id.*)

### d.   Renuka Shetty Das, M.D.

On May 22, 2008, plaintiff presented to the primary care clinic at the NYHQ. (528.) Physical therapy had made her back pain "much better[,]" but the neck pain still "persist[ed]" at a level three, and "occasionally for an hour or so" at a level seven. (*Id.*) She was taking Neurontin and Flexoril, and using a Lidoderm patch. (*Id.*) Renuka Shetty Das, M.D. and Dr. Kumar examined plaintiff and noted the results of the last MRIs of the lumbar spine and right knee. (532,534-35.) They also noted that plaintiff refused epidural steroid injections, recommended physical therapy for her knee and lower back, to continue Flexeril and Lidoderm patch, to reschedule pain management and orthopedic appointments, and to start taking Ultracet as needed. (*Id.*) They also addressed her frequent urination and ovarian cyst. (*Id.*) Dr. Das discussed the

plaintiff's examination with Dr. Kumar and agreed with Dr. Kumar's stated care plan. (535.) Plaintiff missed her next appointment with the orthopedic clinic. (536.)

On December 19, 2013, plaintiff presented to Dr. Das for lower back pain, right shoulder pain, and left breast pain. (1404-06.) Dr. Das noted, *inter alia*, that

> [p]atient recently in ED on 10/16/13 and 10/29/13 for worsening of R shoulder and low back pain. Patient states that she was given Naproxen with much relief of her pain. She no longer sees Neuro, but instead saw Ortho/spine who referred her to pain management and performed an EMG that she has not received the report as of yet. She missed her appointment w/ pain management and will reschedule soon. As per patient, her R shoulder pain is now 3/10 and LBP is 6/10, which is better than before. States that it gets worse with activity and as the day progress[es].

(1404.) She is taking Naproxen. (1405.) The doctor found full ROM in her extremities. (*Id.*) The doctor gave a refill of Naproxen. (*Id.*)

### e.  Jason Hu, M.D., Orthopedist

On February 25, 2013, Jason Hu, M.D., an orthopedist, examined plaintiff by referral from Dr. Sung for her lower back pain which she reported had worsened over the last six years. (1426.) She reported that the pain worsens when she walks, sits, and stands, and improves when she lies down. (*Id.*) At the time of this examination the pain was at a level 9. (*Id.*) After "a long walk she has numbness in the last 3 toe digits." (*Id.*) She reported that physical therapy, Flexeril, and Naprosyn have

helped. (*Id.*) Upon examination, Dr. Hu found "positive tenderness at the spinous process and at the PSIS[28]." (1427.) He also found that there was "illicit pain" at "flexion at 70, and extension at 20[,]" that motor strength was 5/5 bilaterally in all extremities, sensation intact, that her "2+ b/l" in lower extremities, "positive active straight leg raise on the right, equivocal seated slump b/1, positive FABER on left with contralateral to the left[.] equivocal FABER on the right Negative p4 and hip grind b/l negative gaenslen test b/l[.]" (*Id.*) He further found a little tenderness on the left cervical spine, "pain with lateral bending[,]" and negative Spurlings. (*Id.*) He noted the results of the MRIs taken on September 15, 2010 of her cervical, thoracic, and lumbar spine. (*Id.*)

Dr. Hu diagnosed plaintiff with lumbago and cervicalgia. (*Id.*) He prescribed Naprosyn, ordered x-rays of her lumbar and cervical spine, referred her to physical therapy, and stated that he may consider injection options and an MRI in the future. (*Id.*) On the same day, February 25, 2013, a radiologist sent Dr. Hu results of x-rays of her lumbar spine which showed that "compared to prior study dated 9/13/10 again seen is a slight curvature convex to the right[.]" (925-26.)

---

[28] The acronym "PSIS" stands for "posterior superior iliac spine" which are "the hip bones located towards the back of the body." https://medical-dictionary.thefreedictionary.com/PSIS (last visited May 12, 2018).

Plaintiff returned to see Dr. Hu a year later, on February 10, 2014, to consult for a cervical epidural injection. (1401, 1402.) Her complaints and medical conditions were consistent with Dr. Hu's prior notes, except that a left breast mass was a new listed condition. (1401.) Plaintiff was not going to physical therapy. (*Id.*) After a physical exam, the doctor gave her a refill of Naproxen, newly prescribed her Protonix (for GERD), and recommended physical therapy. (1402.) He would possibly consider more imaging and injections if pain persists. (Id.) On March 17, 2014, x-rays of her shoulder were normal. (933.)

On March 24, 2014, plaintiff had a follow-up appointment with Dr. Hu. (1392.) He noted that an EMG/NCV on November 2013[29] showed "evidence of C7-8, C8-T1 cervical radiculopathy[.]" (1393.) He prescribed Naprosyn, Baclofen, Gabapentin, gave her a physical therapy referral, and recommended that she continue Protonix. (1394.) He instructed her to avoid strenuous activities. (*Id.*) On May 5, 2014, she returned to Dr. Hu. (1371.) Her medical history, medications, and symptoms were consistent with her previous visit. (1371-72.) He ordered an EMG for her lower extremities. (1373.) His prescriptions and instructions were the same as the previous

---

[29] This EMG was likely ordered by Dr. Gasalberti. (1336.)

visit. (*Id.*) On May 22, 2014, an EMG/NCS intake form was filled out for plaintiff on referral from Dr. Hu. (1328.) It states that plaintiff has arthritis, pinched nerve, carpal tunnel, spinal stenosis, burning, numbness, tingling, and weakness. (*Id.*)

### f. Tony Quach, M.D., Orthopedist

On March 17, 2014, orthopedist Tony Quach, M.D., treated plaintiff and noted that she was overweight. (1395.) After a physical examination and a review of the "[a]vailable [i]maging [s]tudies[,]" the doctor also diagnosed her with left shoulder pain and shoulder impingement, prescribed physical therapy, and instructed her to avoid aggravating activities. (1396-97.) He did not prescribe any medication. She was taking Naproxen, Ergocalciferol, and Vitamin B. (1395.) On June 2, 2014, plaintiff presented to Dr. Quach for her right shoulder, complaining that lifting and overhead activities are painful, and that pain radiates down her right arm. (1358.) She was diagnosed with left shoulder pain and shoulder impingement. (*Id.*)

### g. Wei Fun Sung, M.D.

On January 7, 2013, resident Mark Vinelli, D.O., supervised by the attending, Wei Fun Sung, M.D., treated plaintiff. (678-79.) She complained of back pain radiating down to her right leg, pain worse with movement, and reported taking

Advil twice a day with some relief. (678.) Dr. Vinelli noted
that her last MRI was on September 15, 2010. (*Id.*) He found her
positive for parethesias, motor strength was 5/5 throughout, and
noted full ROM. (*Id.*) He prescribed Flexeril, referred her to
the spine clinic, and recommended that plaintiff lose weight,
exercise, and change her diet. (679, 1341.) He also prescribed
Omeprazole, Ibuprofen, Ergocalciferol, Vitamin B12, and
recommended that she continue with her other medications. (680,
1342.)

On March 5, 2014, Dr. Sung treated plaintiff for her
foot injury for which she also went to the ER on February 24,
2014. (1398-1400.) She reported hurting her toe after dropping
something on it, and getting a boot at the ER; she feels better
but tenderness remains; she stopped wearing the boot because it
was too hard to walk with it. (1398.) She also reported being
"fatigued[,]" having back and neck pain, and that she needs
medical clearance to receive physical therapy for her neck given
her foot injury. (*Id.*) She reported being told that she has a
pinched nerve, but did not specify by whom and when. (*Id.*) She
is taking Naproxen and Protonix. (*Id.*) Dr. Sung noted the
results of the following:

> XR Spine - Lumbar - 2 Or 3 Views (Order Date -
> 02/25/2013) (Collection Date - 02/25/2013); MRI Pelvis
> W/O Contrast (Order Date - 11/14/2012) (Collection
> Date - 11/14/2012); XR Wrist 3 views Min RT (Order
> Date - 10/16/2012) (Collection Date - 10/16/2012); XR

> Spine - Lumbar - 2 Or 3 Views (Order Date -
> 05/08/2012) (Collection Date - 05/08/2012).

(1399.) Upon examination, Dr. Sung noted that other than the "mild swelling" on her left fifth toe and a "small area of ecchymosis on [the] toe nail[,]" her extremities were normal. (*Id.*) Dr. Sung diagnosed her with "[l]umbar radicular pain[,]" and "[c]ervical radiculopathy[.]" (1399-1400.) Dr. Sung also diagnosed plaintiff with a Vitamin D deficiency and being overweight. (1400.) The doctor refilled the Naproxen prescription for the lumbar pain, cleared her for physical therapy on her neck, referred her to podiatry for the toe injury, and ordered multivitamins. (*Id.*)

On May 15, 2014, plaintiff returned to Dr. Sung complaining of pain in her right small lymph node for the past four days. (1367-69.) He noted that she had a dental procedure five months ago, that Dr. Hu is treating her for pain management, and that there is an EMG pending by Dr. Hu. (1367.) Her medical history was consistent with his prior report. (*Id.*) She was still taking Protonix, but not Naproxen which she was taking when she presented on March 5th. She was also taking EC-Naprosyn and Baclofen (*id.*), which she was not taking on March 5th. On examination, Dr. Sung noted that everything was normal, except a "[s]mall movable, submental lymph node" and "mild tenderness" on touch of the neck. (1368.) Dr. Sung diagnosed her

with adenitis, fatigue, and ovarian cysts. (*Id.*) The doctor
instructed her to return in four days to check on the lymph
nodes, ordered a full metabolic panel to address her fatigue,
recommended multivitamins, and instructed her to continue all
her medications. (1368-69.)

       On May 23, 2014, plaintiff presented

> as a walk in for concerns for sensation of tongue
> swelling/puffiness that began yesterday and has since
> improved after lasting for 3 hours and since then pt
> states the muscles under her tongue feel stretched and
> tight. pt stated yesterday she went to get her EMG
> [with Dr. Hu] of lower back and limbs, did not eat any
> foods that were new, foreign or different. She had
> potato chips prior to onset of her tongue problems.
> She stated she had varying oral sensations of
> heaviness and this has never occurred before. Denies
> difficulty breathing, congestion, chest pain,
> palpitations.

(1360.) Dr. Sung treated her and noted that she was positive for
the "EBV antibody" and noted the May 19, 2014 test results.
(*Id.*, 1362.) Her medical history was consistent with his prior
treatment notes, and now included that she had a hand sprain
that resolved on May 20, 2013, and Angioedema. (1360.) The
physical examination revealed "motor strength normal upper and
lower extremities, sensory exam intact[,]" and full ROM in the
neck with a "[s]mall movable, submental lymph node[, and] mild
tenderness on palpation." (1362.) Dr. Sung started her on
Benadryl and an EpiPen for allergies (1362-63), and instructed
her to continue Baclofen, Ex-Narosyn, and Protonix. (1363.)

There were no significant changes when plaintiff presented again to Dr. Sung on May 29 and June 5, 2014. (1357, 1359.)

### 4. Physical Therapy at the NYHQ

Between January and April 2008, Plaintiff went for about ten physical therapy sessions. (280-81, 297-98, 301-04, 310-11.) She would present with pain between a level 3 when resting and 7 with activity, although reported that it could go up to an 8 or 9. (280, 297, 298, 301-04.) On January 22, 2008, she filled out a self-evaluation noting that she was "able" to take care of her grooming needs, such as showering and clothing herself, to sit for 15 minutes, drive for less than 30 minutes, that it was "somewhat difficult" for her to stand for 15 minutes, drive for more than 30 minutes, or sleep for more than four hours and sleep for more than an hour, and that it was "very difficult" for her to sit or stand for longer than 30 minutes. (310-11.)

On January 22, 2008, she presented with lower back pain resulting in difficulty standing or sitting for more than 30 to 60 minutes and bending forwards or backwards. (280.) She also stated that she could walk four to five blocks but it depends on the pain, and that pain affects her sleep. (*Id.*) She was taking Flexaril. (*Id.*) She wanted to be able to swim again and used to play tennis. (*Id.*) The ROM in her lumbar spine was between 10 and 40 percent. (281.) SLR in her right side was 45

degrees and SLR in her left side was 60 degrees. (*Id.*) Muscle strength was 5/5 for all extremities except that her hip, knees, "DF," and "PF" were 4/5. (*Id.*) It was recommended that plaintiff come twice a week for seven to eight weeks. (*Id.*) On March 5, 2008, she reported that pain had eased since she began physical therapy, and that she could walk a few blocks without pain. (301.) Her lumbar ROM had improved to between ten and 55 degrees, muscle strength in her extremities was the same except for the left side PF which went down to 3/4. (*Id.*) Plaintiff also reported neck pain for more than a year, pain when she rotates or bends her neck, and numbness in her hand "'every once in a while'[.]" (*Id.*) But upon touch, she did not feel pain in her neck or when she rotated it. (*Id.*) Her cervical ROM was between ten and 45 degrees. (302.) On March 14, 2008, she had "significant difficulty performing lumbar stabilization exercise . . . ." (299.) On April 4, 2008, she had difficulty contracting her lower abdominals. (297.)

   Between February and August 2009, plaintiff went for about a dozen physical therapy sessions. (278-9, 282-289, 290-91, 293-5, 807, 809, 815.) She presented with pain ranging from levels 3 to 8 in her lower back and right knee. (*Id.*) The ROM in her lumbar spine was between 15 and 40 degrees with pain, SLR on the right side FROM but pain and locking sensation in right knee reported at 45 degrees, muscle strength was at 3/5 in her right

and left hips, knees, DF PF, and her "long sit abdominal" was at
two out of five. (295.) Her right knee hurt when she climbed
stairs and upon examination, it was noted that her gait pattern
was "mildly antalgic[.]" (*Id.*) On March 10, 2009, she presented
with lower back pain from "walking too much yesterday[.]" (288.)
On March 24, 2009, the treatment notes stated that she had
lumbar instability and impaired right lower extremity and muscle
after difficulty with "house chores[.]" (291.) On March 29,
2009, she presented with a "burning sensation" down to right
"poster thigh (occasionally)[,]" and treatment reflected that
she cannot squat, and can kneel or pick up objects from the
floor, but only with pain. (290.) On July 16, 2009, Dr. Gibbs of
the NYHQ referred her to physical therapy after diagnosing her
with "sacroiliitis[30][.]" (279.) Dr. Sung gave her another
referral on July 23, 2009 (278) and was referred to as her
primary physician. (808.) On July 28, 2009, she reported
shooting pain at a level eight that increased with housework and
improved when she lay down. (807.) In a self-evaluation, she
reported being "[i]ndependent" with holding utensils, putting on

---

[30] "Sacroiliitis … is an inflammation of one or both of your sacroiliac
joints — situated where your lower spine and pelvis connect. Sacroiliitis
can cause pain in your buttocks or lower back, and can extend down one or
both legs. Prolonged standing or stair climbing can worsen the pain.
Sacroiliitis can be difficult to diagnose, because it can be mistaken for
other causes of low back pain. It's been linked to a group of diseases
that cause inflammatory arthritis of the spine."
https://www.mayoclinic.org/diseases-conditions/sacroiliitis/symptoms-
causes/syc-20350747

a shirt, socks, pants, shoes, using the toilet and bathing, getting in and out of bed, walking, using stairs, and standing. (809.) On August 5, 2009, she complained of neck pain and reported deferring "biking" or "hiking" that day because of knee pain. (815.)

About six weeks after her last physical therapy session, on September 23, 2009, she appeared for a hearing in front of the ALJ. (12.) She did not return to physical therapy until five years later.

Between March and April 2014, plaintiff went for multiple physical or occupational therapy sessions on referral from Drs. Sung and Hu, each of whom was listed as her primary care physician. (1375-91.) On April 7, 2014, plaintiff reported being able to drive and experiencing trouble with upper extremity dressing. (1384.) The ROM in her cervical spine was between 20 and 70 percent. (Id.) On April 10, 2014, she did not report any neck pain. (1381.) She was referred for pain in her right shoulder, right shoulder, which was between levels 1 and 3 with inactivity, at a level 6 with overhead movement and at night. (*Id.*) The progress notes also state that the "[e]mpty

[c]an [t]est[,][31]" "Hawkins-Kennedy[32][,]" and "Neer Impingement[33]"
were each right, positive, left, negative. (*Id.*) She reported
difficulty with reaching, cleaning, using both her hands, and
"upper extremity dressing[.]" (1382.) The therapist noted that
she had "limited tolerance to therapy due to increase pain with
even gentle ROM." (*Id.*)

### 4.  SSA Consulting Orthopedic Steve Calvino, M.D.

On October 29, 2007, plaintiff was seen by Dr.
Calvino, an orthopedist, for an examination by the SSA. (243.)
Plaintiff reported that her injuries arose from the car accident
in January 2006. (*Id.*) She also reported cooking and cleaning
daily, doing laundry sometimes, and taking care of her daughter.
(244.) Upon examination, the doctor noted that plaintiff was "in

---

[31]  "On the side to be tested the one of the examiner's hands stabilizes
shoulder girdle. The arm to be tested is moved into 90 degrees of forward
flexion in the plane of the scapula (approximately 30 degrees of
abduction), full internal rotation with the thumb pointing down as if
emptying a beverage can. . . . The examiner's other hand applies downward
pressure on the superior aspect of the distal forearm and the patient
resists.… The Empty Can Test is considered positive if there is
significant pain and/or weakness." http://physicaltherapyweb.com/empty-
can-test-shoulder-orthopedic-examination/ (last visited May 12, 2018).

[32]  "The examiner moves the arm of the shoulder to be tested such that the arm
is in 90 degrees of forward flexion and the elbow is flexed to 90 degrees.
. . . In the starting position the examiner forcefully moves the patient's
shoulder into internal rotation to the end or range of motion or until
reports of pain. . . . The Hawkins Kennedy test is considered positive if
pain is reported in the superior – lateral aspect of the shoulder."
http://physicaltherapyweb.com/hawkins-kennedy-test-orthopedic-shoulder-
examination/ (last visited May 12, 2018).

[33]  While the arm raised up and close to the head, "the examiner internally
rotates the patient[']s arm and forcefully moves the arm through the full
range of forward flexion or until reports of pain."
http://physicaltherapyweb.com/neer-test-orthopedic-shoulder-examination/
(last visited May 12, 2018).

no acute distress. Gait is mildly antalgic, limiting weight
bearing on the right leg when walking. Can walk on heels and
toes without difficulty. Squat full. Station normal. The
claimant ambulates with a straight cane for pain. The assistive
device is not medically necessary and is no[t] consistently used
during the examination. The claimant's gait remains antalgic,
despite use of a straight cane. Needs no help changing for the
exam or getting on and off exam table. Able to rise from chair
without difficulty." (244.) He wrote that she had full grip
strength in her extremities. (*Id.*) He also found no flexion
issues or issues with rotation in her cervical spine. (*Id.*) As
to her thoracic and lumbar spines, he opined that "[f]orward
flexion . . . is limited to 60 degrees due to pain, extension 0
degrees, lateral flexion limited to 10 degrees bilaterally due
to pain, and lumbosacral rotation is limited to 10 degrees
bilaterally due to pain." (245.) He found no issues with spasms
or tenderness. (*Id.*) He also found no issues with her lower
extremities. (*Id.*) He found full ROM and full strength in her
hips, knees, and ankles. (*Id.*) He found "[n]o muscle atrophy. No
sensory abnormality. Reflexes physiologic and equal. No join
effusion, inflammation, or instability." (*Id.*) An x-ray on the
right knee showed "negative radiographic exam." (245, 247)

He diagnosed plaintiff with "[c]hronic neck, back, and
right leg pain after the claimant was struck by a motor vehicle

in 2006." (*Id.*) He found that "[b]ased on today's evaluation, the claimant is mildly limited for any heavy lifting, carrying, frequent squatting, or climbing activities. There are no restrictions for standing, walking, sitting, reaching, pushing, pulling, or fine motor activities of the bilateral upper extremities." (245.)

5. **EXPERT TESTIMONY**

    a. **Chaim B. Eliav, M.D.**

    Chaim B. Eliav, M.D., is a board-certified physical medicine and rehabilitation specialist who testified as a medical expert at the July 10, 2014, remand hearing in front of ALJ Jay Cohen. (339, 359-72, 493.) The doctor had not examined plaintiff; rather his testimony was based on a review of the medical record and testimony that he elicited from plaintiff at the hearing. (359-60.)

    Dr. Eliav noted that the March 10, 2005, MRI of the right knee indicated "subtle changes in the medial meniscus" and asked plaintiff whether she ever had "a frank meniscal tear" and an MRI that reflected such a tear. (366.) Plaintiff responded that she had another MRI of her knee in 2006 or 2007 indicating "a tear in the knee[.]" (*Id.*) The doctor responded that he wanted to review that MRI. (367.) Plaintiff also testified that in 2010 or 2011, Dr. Gibbs had conducted an EMG which showed carpal tunnel, and that in November 2013, an EMG was conducted

of her upper extremities. (368.) Dr. Eliav also asked plaintiff if she was ever given any exercises to address her pain. (368.) Plaintiff responded yoga and physical therapy, but that the physical therapy exercises would provide only momentary relief. (368-69.) In response to Dr. Eliav's questions, plaintiff further testified that although she has been given three back braces by doctors, she does not use any of them when she leaves her house because they are too heavy. (368-70.) She also does not wear anything to support her knee. (370.)

After questioning plaintiff, Dr. Eliav testified that he was hesitant to opine on whether plaintiff has "severe medical impairment[s]" because he wanted to review the results of any testing done on plaintiff, rather than rely solely on the notes by physicians summarizing the test results. (370-71.) Dr. Eliav explained that "[m]y past experience has been that there are, often enough, occurrences where citation by treating physician and the actual report by testing physicians are not concurrent." (371.)

But Dr. Eliav subsequently testified that based on the record in front of him, plaintiff did not have any impairments "which impose[] more than minimal effect on the ability to either perform work functions or activities of daily living[.]" (372.) He further testified that "her testimony and the evidence that I saw in this very voluminous record is—are not consistent

with each other." (373.) The doctor also testified that the record does not support her complaints of limitations in using either arm, specifically that numbness leads to her inability to fully use either arm, and that lumbar radiculopathy does not necessarily mean that she would be limited in how long she can sit. (391-92.) But Dr. Eliav did not elaborate on either opinion. The ALJ decided to hold a supplemental hearing so that plaintiff could provide Dr. Eliav with the copies of any imaging or other test results. (375-76.)

On July 24, 2014, plaintiff's attorney wrote a letter to the ALJ. (499-501.) In the letter, the attorney stated that he was listing "actual radiology reports" for Dr. Eliav's reference. (500.) The attorney presented a list of x-rays and MRIs that were in the record at the time of the hearing. (500-01.) The list did not include the results of the August 1, 2007, MRI of plaintiff's right wrist. (854-55.) Nor did the attorney mention any missing tests or reports or medical records. Nor did he seek the ALJ's assistance in securing any missing records.

At the supplemental remand hearing on October 2, 2014 (396), Dr. Eliav confirmed his prior testimony that plaintiff's "severe medical impairment[s]" were "cervical and lumbar radiculopathy" and "discopathy of the back and neck." (400.) Dr. Eliav did not testify that plaintiff's knee was a medical impairment. He also testified that "[d]iscopathy is a change in

the -- or preexists, whereby the height of the disc is less, indicating changes that can effect both pain as well as elements such as the bulging disc can come into contact with." (*Id.*) He further testified that these impairments are not listed impairments under the Social Security regulations. (401.) He also testified that these medical impairments impact plaintiff's ability to work in the following way: lift up to ten pounds frequently and 20 pounds occasionally, cumulatively, stand or walk for four hours, and, cumulatively, sit for six hours, with a break every hour for five minutes. (401-03.) He further testified that she cannot crawl or climb, and can only occasionally bend, kneel, crouch, and squat. (403-04.) He also testified that she has no limitations on foot controls, reaching, grasping, handing, or environmental issues. (404.) Dr. Eliav testified that there was "minimal evidence" of the source of her pain, mentioning only the March 29, 2006 EMG. (405.) The doctor also testified that it was difficult to answer if her "pain experience" was greater than what was presented in the objective medical record because they "are two different things." (*Id.*) He also testified that he had accommodated for medical conditions are that "pain generator[s]." (408.)

### b.   **Louis J. Slozzy, Vocational Expert**

Louis J. Slozzy testified at the October 2, 2014, supplemental remand hearing as a vocational expert. (414-15,

495.) He testified that someone fitting plaintiff's profile could perform work in the national economy. (414.) He listed three jobs for unskilled labor for those with sedentary or light capabilities that match plaintiff's profile. (414-15.) But he also testified that anyone who needs a break of six minutes every hour is likely precluded from the three jobs and "approximately 99 percent of the remaining occupations in the competitive work force." (415.)

## E.   PLAINTIFF'S ALJ HEARING TESTIMONY

### 1.   The September 23, 2009 ALJ hearing

Plaintiff appeared for a hearing in front of ALJ Michael Cofresi on September 23, 2009. (12.) Plaintiff was accompanied by a non-attorney representative. (19.)

She testified that she has "severe pain" in her lower back such that she cannot move without being in pain. (28.) In 2006, she was in a car accident and instituted a personal injury lawsuit. (*Id.*) After the accident, plaintiff had three doctors' visits, including to a neurologist, and obtained physical therapy.  (29.) She is no longer receiving medical care for the accident. (*Id.*) She also complained of "a torn meniscus which limits my walking[,]" and "cervical stenosis in the . . . back. . . ."  (30.) She also testified that her "neck stiffens up to where sometimes I, I get shock if I turn my head, and it shoots pain down my back. The pain in my lower back gets excruciating

after sitting for a long time, about, . . . 45 minutes, maybe a hour and a half sometimes." (*Id.*) She also complained of pain in her upper back, "it feels like it has a hard plate or metal or something in it to where it's very sensitive to . . . move, or sit, or to tolerate." (*Id.*) She was taking Baclofen, uses a Lidoderm patch for her back, and Vicodin. (30-31.)

She also testified that every day she helped her daughter get ready for school, sometimes her sister took the daughter to school by bus, plaintiff tried to clean the house by mopping, cooking, during which she had to rest every 15 or 20 minutes, either she or her sister picked up her daughter from school, tried to cook but that became "difficult[,]" and tried to do laundry. (31-32.) Her sister drove her to the hearing. (32.) Her sister did the grocery shopping and took her to appointments, or plaintiff took the bus. (33.) Her sister had taken her to New Jersey and Long Island for shopping. (33-34.) They had also gone to Atlantic City and stayed overnight and she walked on the boardwalk. (34.) Sometimes she could walk five blocks before feeling uncomfortable or sometimes just two blocks. (34-35.) She could stand for about an hour-and-a-half. (35.) She could sit between 40 minutes to an hour before "severe" pain. (*Id.*)  She could carry "a jug of water" from the store or an avocado and an ice cream container. (*Id.*)

A week before the hearing, plaintiff was in the

emergency room where she was given a cane which she used at the hearing. (36-37.) She testified that the emergency room doctor diagnosed that the pain in her foot was caused by "stenosis" and prescribed her medication. (40.) Dr. Sung, her primary care physician, prescribed her a back brace. (37.) She avoided taking the subway because the rides are painful. (38.) Over the past year or so, she had fallen three times. (40-41.) After the last fall, she went to the emergency room where she was told that "I have symptoms of a[n] elderly person" and given a referral to a neurologist, which she did not go to due to issues with her insurance. (41.)

### 2. The Remand ALJ hearing on July 10, 2014

On July 10, 2014, plaintiff, represented by counsel, testified in front of ALJ Jay Cohen. (339.) Plaintiff was then living in an apartment with her daughter. (344.) She was not working because of "numbness in her limbs," neck and lower back pain. (345.) "I went from sitting to standing to lying down outside. And that's pretty much what happens to me within an hour of the activities." (346.) She could sit for about 20 to 25 minutes, stand for about 15 minutes, and walk for about 15 to 20 minutes. (*Id.*) She could carry light groceries so long as she did not feel numbness in her arms. (*Id.*) She experienced numbness from activities like sitting, walking, or standing. (346-47.) A doctor recommended an epidural steroid injection for

her back, but she opted for physical therapy which assists with pain management for the day. (347-48.) She also found physical therapy useful for the pain in her neck. (349.) A doctor recommended an operation for her knee. (*Id.*) She had physical therapy in the past. (350.)

Plaintiff reported that she cleans and cooks and does laundry, but "in stages" because she has to lie down in intervals, such that the tasks stretch out over the day or a few days. (351.) She does grocery shopping. (351-52.) Occasionally she can drive. (352.) She used to ride the bus to get to her doctor appointments, but was taking "ambulatory service[s]" to doctor's appointments and her sister drove her to other appointments. (*Id.*) The shaking of the subway and using stairs aggravated her back. (353.) She reported that she wakes up about every four hours while sleeping and uses a lot of pillows to sleep. (353-54.) Her doctor told her that she does not qualify for a hospital bed. (354.) She experienced numbness in her arms, fingers, and legs. (*Id.*) The pain in her lower back is constant and becomes more aggravated with activity. (355-56.) She experienced pain in her neck once a month but it would last for days. (356-57.) She gets "lightheaded and headaches" and cannot focus well. (359.)

When asked if she could do a sedentary job requiring her to mostly sit, she responded: "I almost 100 percent doubt it

because what I do at home is not minimal but—yeah, pretty much.
But it's at my own pace, and I got to take breaks in between so
I can't imagine being able to do it. . . . I've been here for
about a hour. I was almost in tears. I was literally laying down
in chairs outside, and that's what helps me—lying down when I'm
in this situation." (358-59.)

**PROCEDURAL HISTORY**

On October 30, 2009, the ALJ issued a decision denying
plaintiff SSI benefits. (12-18.) In making this determination,
the ALJ used the five-step sequential evaluation process
prescribed by 20 C.F.R. § 404.1520(a) to determine disability.
(12-14.) Under step one, the ALJ determined that plaintiff had
not engaged in SGA since the date of her SSI application, July
25, 2007. (14.) Under step two, the ALJ further determined that
plaintiff suffered from "the following severe impairments: mild
cervical spine stenosis and right subtle medial meniscal
tear[.]" (*Id.*) Under step three, the ALJ determined that
plaintiff did not have an impairment or combination of
impairments that met "the severity of one of the listed
impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR
416.920(d), 416.925, and 416.926)." (*Id.*) Before considering
step four, the ALJ determined that plaintiff had the RFC "to
perform the full range of sedentary work as defined in 20 CFR
416.967(a)." (*Id.*) Under step four, the ALJ determined that

plaintiff could not perform her past relevant work as a hairstylist because it "requires the residual functional capacity for light work . . . ." (17.) Under step five, the ALJ determined that plaintiff was young under the SSA regulations because she was 34 years old when she applied for SSI benefits, that she had at least a high school education, that she could speak English, and that there were jobs that plaintiff could perform that exist in significant numbers in the national economy. (*Id.*) Thus, the ALJ concluded, a finding of "not disabled" was necessary. (18.)

On September 23, 2010, the Appeals Council denied plaintiff's request for review of the ALJ's decision, making the ALJ's decision the final decision of the Commissioner. (2-4.) On March 18, 2011, plaintiff filed a complaint in this jurisdiction seeking to overturn the ALJ's October 30, 2009 decision. (ECF No. 1, Complaint, 11-CV-1349, filed 06/27/2016.) On June 6, 2013, the parties agreed to withdraw their respective motions for judgment on the pleadings, and, that the Commissioner's decision would be reversed, and plaintiff's claim for SSI benefits, filed on July 25, 2007, would be remanded for further administrative proceedings, including a new hearing and a new decision. (ECF No. 34, Stip. and Order, 11-CV-1349.) The Court ordered that on remand, the ALJ "will evaluate the new evidence submitted to the Court and any other new evidence . . . ." (*Id.*

at 1.) On November 25, 2013, the Appeals Council remanded the case back to the ALJ, based on the Stipulation and Order, and specified the issues to be resolved by the ALJ on remand. (422-27.)

On October 10, 2014, ALJ Jay L. Cohen denied plaintiff's application for SSI. (322-35.) The ALJ reviewed the record on remand from the Appeals Council after holding a hearing on July 10, 2014, and a supplemental hearing on October 2, 2014. (322.) In the decision, the ALJ discussed the specific directives from the Appeals Council. (*Id.*) He further noted that, as required under Second Circuit law, "every reasonable effort was made to develop the medical history of this claimant." (323.) He stated that "[a]lthough supplemental security income is not payable prior to the month following the month in which the application was filed (20 CFR 416.335)," based on the evidence, he found that plaintiff was not disabled since the date of her SSI application, July 25, 2007. (*Id.*)

He conducted analysis under the five-step sequence listed in the SS regulations. (323.) Under step one, he concluded that plaintiff had not engaged in SGA since July 25, 2007. (325.) Under step two, he concluded that plaintiff's "severe" medical impairments are "degenerative disc disease and radiculopathy of the cervical and lumbar spine, and a right knee medial meniscal tear . . . ." (*Id.*) However, he concluded that

her headaches and uterine fibroids are not severe medical impairments because they "have not been shown to cause more than minimal limitations in her ability to perform basic work activities . . . ." (*Id.*) Under step three, the ALJ concluded that her impairments or combination of severe impairments do not "meet or medically equal[] the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR §§ 416.920(d), 416.925 and 416.926)." (*Id.*) The ALJ specifically considered sections 1.02 and 1.04 and noted that his finding was consistent with the expert medical testimony. (*Id.*) Under step four, the ALJ's RFC assessment was that plaintiff could perform a substantial range of light work under 20 C.F.R. § 416.967(b). (*Id.*) He concluded that plaintiff can "lift and carry 10 pounds frequently and 20 pounds occasionally, [could] sit for 6-8 hours during an 8-hour workday with a 5 minutes break at the work station every hour to change position, and [could] stand and walk for a combination of 4 hours during the workday with a 5 minute break every hour at the workstation to change position. She [was] unable to climb ladders or scaffolds, or to crawl, but [could] occasionally bend, squat, kneel, crouch, and climb stairs and ramps." (*Id.*)

        The ALJ conducted a two-step analysis. First, he determined whether she has "an underlying medically determinable . . . impairment" as evidenced by "by medically acceptable

clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the claimant's pain or other symptoms." (*Id.*) Second, he determined whether the medical impairments "could reasonably be expected to produce the claimant's pain or other symptoms[,]" including whether "the intensity, persistence, and limiting effects of the claimant's symptoms . . . limit the claimant's functioning." (326.) The ALJ noted that plaintiff had been injured after a January 2006 accident. (*Id.*) He then considered her March 2006 EMG and MRIs of her cervical and lumbar spine. (*Id.*) He also considered the treatment notes of Drs. Krinick, Lifschutz, and the consultative physician, Dr. Calvino. (326-27.) The ALJ also considered treatment notes from the NYHQ. (327-31.) The ALJ then considered Dr. Eliav's hearing testimony. (331.) The ALJ concluded that Dr. Eliav's "opinion is accepted, as it is consistent with the medical evidence as a whole." (*Id.*) The ALJ then considered plaintiff's descriptions of her symptoms and how they impact her activities of daily living. (331-32.) The ALJ then concluded that although plaintiff's severe medical impairments "could reasonably be expected to cause the alleged symptoms; . . . [her] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible . . . ." (332-33.)

The ALJ then accorded weight to the various medical

opinions. He accorded "little weight" to Dr. Lifschutz's opinion that plaintiff was "temporarily totally disabled" because those determinations are reserved for the Commissioner, but did consider Dr. Lifschutz's opinion on her restrictions as consistent with the medical evidence. (333.) The ALJ accorded "some weight" to Dr. Krinick's opinion that plaintiff can work "in a light duty capacity" because it is consistent with the medical evidence; however, the ALJ did not accord more weight to the opinion because the doctor failed to provide specifics regarding plaintiff's capabilities. (333-34.) The ALJ gave no weight to the DDS' opinion because the examiner was not a doctor. (334.)

The ALJ accorded "[g]reat weight" to the testifying medical expert opinion of Dr. Eliav because he "is a medical doctor with an appropriate area of expertise who is familiar with the disability guidelines, reviewed all of the evidence of record, and heard the claimant's testimony, and whose opinions are consistent with the medical evidence as a whole." (333.) He also gave "some weight" to the SSA's consulting orthopedist Dr. Calvino's opinion that plaintiff "was mildly limited in any heavy lifting, carrying, frequent squatting, or climbing activities, with no restrictions in fine motor activities with the bilateral upper extremities[.]" (*Id.*) "In sum, the above residual functional capacity assessment is supported by the

opinions of medical expert Dr. Eliav, the opinions of Dr.
Calvino to the extent that they are consistent with those of Dr.
Eliav, and the evidence as a whole." (*Id.*) Next, the ALJ found
that plaintiff's past jobs as a cashier/waitress, in customer
service/doing clerical work, and hair stylist do not qualify as
"past relevant work" because plaintiff had no SGA documented in
the record. (334.) She was young when she filed her SSI
application, "has at least a high school education[,]" and could
"communicate in English." (*Id.*)

Under step five, the ALJ opined that "[c]onsidering
[plaintiff]'s age, education, work experience, and residual
functional capacity, there are jobs that exist in significant
numbers in the national economy that [plaintiff] can perform (20
CFR 416.969 and 416.969(a))." (*Id.*) The ALJ opined that "[i]f
the claimant had the residual functional capacity to perform the
full range of light work, a finding of 'not disabled' would be
directed by Medical-Vocational Rule 202.21. However, the
claimant's ability to perform all or substantially all of the
requirements of this level of work has been impeded by
additional limitations." (335.) Therefore, the ALJ relied on the
vocational expert's testimony regarding the jobs that exist in
the national economy that plaintiff could perform. (*Id.*) Thus,
the ALJ opined, "[a] finding of 'not disabled' is . . .
appropriate under the framework of the above-cited rule." (*Id.*)

On April 26, 2016, ALJ Cohen's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review. (ECF No. 1, Appeals Council letter to plaintiff, Apr. 26, 2016, at 1.) Proceeding *pro se*, plaintiff filed the instant lawsuit on June 27, 2016, alleging that she has been disabled since 2001 based on arthritis in her spine and hip. (ECF No. 1, Complaint, at 1.)

## DISCUSSION

### A. ELIGIBILITY FOR SSI BENEFITS AND DIB

In order to be eligible for SSI benefits or DIB, an adult claimant must be disabled. 42 U.S.C. §§ 423(a)(1)(E), 1381a. A claimant is "disabled" if (s)he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). The impairment(s) must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" 42 U.S.C. § 1382c(a)(3)(B).

### B. STANDARD OF REVIEW FOR THE ALJ

#### 1. The Commissioner's Five-Step Analysis of Disability Claims

The Social Security Administration has promulgated a five-step sequential analysis requiring the ALJ to find the claimant disabled if the ALJ determines: "(1) that the claimant is not working,[34] (2) that he [or she] has a 'severe impairment,'[35] (3) that the impairment is not one that is [listed in Appendix 1 of the Regulations] that conclusively requires a determination of disability,[36] . . . (4) that the claimant is not capable of continuing in his [or her] prior type of work,[37] . . . [and] (5) there is not another type of work the claimant can do."[38] *Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008); see also 20 C.F.R. § 404.1520(a)(4). If after step three the ALJ has found that the claimant's "impairment(s) does not meet or equal a listed impairment," the ALJ will "make a finding about [claimant's] residual functional capacity" ("RFC"). 20 C.F.R. §

---

[34] Under the first step, if the claimant is working and the work he or she is doing is "substantial gainful activity," then the claimant is not disabled regardless of other findings. 20 C.F.R. §§ 404.1520(a)(4)(i), 404.1520(b).

[35] Under the second step, the claimant must have an "impairment or combination of impairments which significantly limits [his or her] physical or mental ability to do basic activities" in order to be classified as severe. 20 C.F.R. § 404.1520(c); see also *id.* § 404.1520(a)(4)(ii).

[36] Under the third step, if the claimant has an impairment that "meets the duration requirement and is listed in appendix 1, or is equal to a listed impairment(s)," the claimant will be found disabled. 20 C.F.R. § 404.1520(d); see also *id.* § 404.1520(a)(4)(iii).

[37] Under the fourth step, the claimant's "impairment(s) must prevent [him or her] from doing [his or her] past relevant work" to be found disabled. 20 C.F.R. § 404.1520(f); see also *id.* § 404.1520(a)(4)(iv).

[38] Under the fifth step, the claimant's "impairment(s) must prevent [him or her] from making an adjustment to any other work" that is available in the national economy in order to be found disabled. 20 C.F.R. § 404.1520(g); see also *id.* § 404.1520(a)(4)(v).

404.1520(e). The claimant's RFC considered at both the fourth and fifth steps of the sequential evaluation. *Id.*

At steps one through four of the five-step analysis, the claimant bears the "general burden of proving that he or she has a disability within the meaning of the Act." *Burgess*, 537 F.3d at 128 (citations omitted). At the fifth step of the sequential evaluation process, the burden shifts from the claimant to the Commissioner "to prove that the claimant, if unable to perform her past relevant work, is able to engage in gainful employment within the national economy." *Sobolewski v. Apfel*, 985 F. Supp. 300, 310 (E.D.N.Y. 1997).

In applying this evaluation process, the ALJ "must consider (1) objective medical facts and clinical findings, (2) diagnoses and medical opinions of examining physicians, (3) the claimant's subjective evidence of pain and physical incapacity as testified to by himself and others who observed him, and (4) the claimant's age, educational background, and work history." *Carroll v. Sec'y of Health & Human Serv.*, 705 F.2d 638, 642 (2d Cir. 1983) (citations omitted). The ALJ's determination "must be set forth with sufficient specificity to enable [a reviewing court] to decide whether the determination is supported by substantial evidence." *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984) (citing *Treadwell v. Schweiker*, 698 F.2d 137, 142 (2d Cir. 1983) ("the propriety of agency action must be

evaluated on the basis of stated reasons")).

## 2. RFC Determination

Once the ALJ has determined that a claimant is not disabled, the ALJ has to determine the claimant's RFC. "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." Social Security Ruling ("SSR") 96-8p[39] at ¶ 1. "RFC is not the *least* an individual can do despite his or her limitations or restrictions, but the *most*." *Id.* at ¶ 5 (emphasis in original).

## C. STANDARD OF REVIEW FOR THE DISTRICT COURT

The district court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). But a district court's review under § 405(g) is not *de novo*, it is more limited. *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984). A district court is empowered to determine only whether the SSA's conclusions are

---

[39] The "PURPOSE" of SSR 96-8p is "[t]o state the Social Security Administration's policies and policy interpretations regarding the assessment of residual functional capacity (RFC) in initial claims for disability benefits under titles II and XVI of the Social Security Act (the Act)." SSR 96-8p.

"supported by substantial evidence in the record and . . . based on a correct legal standard." *Lamay v. Commr. of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009) (citing 42 U.S.C. § 405(g)), *cert. denied*, 559 U.S. 962 (2010); *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987).

"Substantial evidence" connotes "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation marks and citations omitted); *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002) (citations omitted). "[T]he court must not look at the supporting evidence in isolation, but must view it in light of the other evidence in the record that might detract from such a finding, including any contradictory evidence and evidence from which conflicting inferences may be drawn." *Rivera v. Sullivan*, 771 F. Supp. 1339, 1351 (S.D.N.Y. 1991). It is the province of the SSA, not a district court, "to weigh the conflicting evidence in the record." *Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g).

Similar deference, however, is not accorded to the SSA's legal conclusions or to the SSA's compliance with applicable procedures mandated by statute or regulation.

*Townley*, 748 F.2d at 112. "Where an error of law has been made that might have affected the disposition of the case, this court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ." *Id.* (internal quotation marks and citation omitted). "Failure to apply the correct legal standards is grounds for reversal." *Id.* (citation omitted). However, where application of the correct legal principles to the facts on the record could lead only to the same conclusion reached by the Agency, there is no need to remand the case for Agency reconsideration. *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) (citations omitted).

## D.   ANALYSIS

### 1.   Remand is not Warranted to Secure Records from the St. Johns Queens Hospital ("SJQH"); Plaintiff had Sufficient Opportunity to Supplement the Record

Plaintiff argues that remand is warranted because the attorney who represented her during the 2014 hearings failed to obtain certain medical records. (ECF No. 15, Pl.'s Affid./Affir. in Opp. to Def.'s Mot., at 2-4) Plaintiff argues that it was only immediately before the first 2014 hearing that she reviewed the record in front of the ALJ and realized that records from the SJHQ "and recent records for May 2014" and EMGs were missing. (*Id.* at 3.) Plaintiff states that "[i]n speaking with the attorney prior to the adjourned October 2014, the attorney

assured me that all requested records were included in the record, my understanding was that they have been obtained and submitted to SSA. However, this was not a fact, the attorney never made the request for either records; this has become obvious to me in reviewing the record from the U.S. Attorney's office." (*Id.*) Plaintiff argues there is a gap in her medical record. (*Id.*)

Remand is not warranted to obtain the SJQH records because it is too late; the hospital shut down in 2009 and the property itself has been sold.[40] The Court also doubts that these records would be new rather than cumulative. On January 23, 2006, plaintiff was taken to the ER at the SJHQ after she was struck by a car. (90-96, 141.) Plaintiff contends that she was also treated by the hospital. (ECF No. 15, Pl.'s Affid./Affir. in Opp. to Def.'s Mot., at 3-4.) However, the ALJ had reviewed plaintiff's medical records spanning from 2005 to 2014. Thus, he reviewed her medical records pertaining to the timeframe of the accident, 2006.

---

[40] https://jacksonheightspost.com/queens-blvd-building-sells-for-125-million; http://www.crainsnewyork.com/article/20140102/REAL_ESTATE/140109988/former-st-johns-hospital-to-be-converted-to-residential (last visited May 12, 2018).

Plaintiff essentially concedes this point. On May 5, 2015, plaintiff wrote to the Appeals Council seeking reversal of the ALJ's October 10, 2014 decision, partly because she could not obtain the SJQH records since the hospital had closed in 2009. (ECF No. 1, Appeals Council letter to plaintiff, Apr. 26, 2016, p. 2 of 5.)

As for the May 2014 EMG results, they are missing from the record. On May 22, 2014, plaintiff filled out an EMG intake form on Dr. Hu's order. (1328.) The next day, on May 23, 2014, plaintiff told Dr. Sung that on the prior day, she had an EMG test conducted of her lower back and limbs. (1360.) During the July 10, 2014 remand hearing, moreover, plaintiff mentioned that in 2010 or 2011, Dr. Gibbs ordered an EMG that showed carpal tunnel. (368.) She further testified that in November 2013, an EMG was conducted of her upper extremities. (*Id.*) There are no EMG records in the evidence before the court.

But plaintiff's argument that "any missing medical records/pages should be considered a gap in documented health care" is not the law. (ECF No. 15, Pl.'s Affid./Affir. in Opp. to Def.'s Mot., at 3.) The Second Circuit has clarified that "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Rosa v. Callahan,* 168 F.3d 72, 79 n.5 (2d Cir. 1999) (quoting *Perez v. Chater*, 77 F.3d 41, 48 (2d Cir. 1996)). Otherwise, before an ALJ rejects a treating physician's opinion, the ALJ must develop the record. *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008). "Social Security disability determinations are 'investigatory, or inquisitorial, rather than adversarial. It is the ALJ's duty

to investigate and develop the facts and develop the arguments both for and against the granting of benefits.'" *Moran v. Astrue*, 569 F.3d 108, 112-13 (2d Cir. 2009) (citations omitted). Indeed, "[i]n light of the ALJ's affirmative duty to develop the administrative record, 'an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record.'" *Burgess*, 537 F.3d at 129 (quoting *Rosa*, 168 F.3d at 79).

Moreover, the ALJ provided plaintiff with every reasonable opportunity to either obtain these records or seek his assistance in doing so. When plaintiff's counsel raised the issue of missing records during the July 10, 2014 hearing, the ALJ told the attorney that he had subpoenaed all the records that he had been informed of, and that if the attorney had trouble tracking down any missing records, the attorney should contact the ALJ to seek a subpoena. (383-84.) Plaintiff's counsel did not specify that it was the May 2014 EMG that was missing. The ALJ adjourned the hearing for another three months and rescheduled it for October 2, 2014. (375, 396.) In that three-month period, plaintiff's counsel did not identify a single missing record to the ALJ. On July 24, 2014, when plaintiff's attorney wrote to the ALJ to follow-up on the July 10th hearing by identifying, for the medical expert, all "actual radiology reports of claimant's medical condition" that are in

the record (499-501), he did not mention that any records were missing. Nor did the attorney mention any missing records at the supplemental remand hearing on October 2, 2014.

This is not a case like *Clark v. Colvin*, where "the ALJ failed to develop the record fully for the relevant time period in the face of an explicit request for assistance from plaintiff's representative." No. 15-CV-2286, 2016 U.S. Dist. LEXIS 77576, at *38 (S.D.N.Y. June 13, 2016), adopted at 2016 WL 4679730, 2016 U.S. Dist. LEXIS 121118 (S.D.N.Y. Sept. 7, 2016). In *Clark*, the plaintiff's representative subsequently sought the ALJ's help in securing medical records from specified doctors at specified medical institutions, but the ALJ failed to respond to the request. *Id.* at *39. The Court held that "[t]he ALJ erred when he failed to seek additional records . . . because [the doctor] treated plaintiff during the relevant period and plaintiff's representative's letter indicated the existence of an 'obvious gap' in the medical record that may have affected the ALJ's disability determination." *Id.* There was no such request here by plaintiff's counsel. Nonetheless, the Court will determine if the ALJ's opinion is supported by substantial evidence (*see infra*).

   2.   **Remand is not Warranted for the ALJ's Error in Considering Dr. Krinick a Treating Physician**

Plaintiff also contends that the ALJ should not have

considered Dr. Krinick's May 21, 2007, opinion that she can engage in light duty work because he only treated her once and only had a report of an MRI of her right knee, but no other medical records. (ECF No. 15, Pl.'s Affid./Affir. in Opp. to Def.'s Mot., at 3) A treating source is "one who has provided the individual with medical treatment or evaluation and who has or had an ongoing treatment and physician-patient relationship with the individual." *Trail v. Colvin*, No. 5:13-CV-0014, 2015 WL 224753, at *18 (N.D.N.Y Jan. 15, 2015)(quoting *Gray v. Astrue*, No. 06-CV-0456, 2009 WL 790942 at *7 (N.D.N.Y. Mar. 20, 2009)(internal quotations omitted)[41]; *see e.g.*, *Sokol v. Astrue*, No. 05-CV-6631, 2008 WL 4899545, 2008 U.S. Dist. LEXIS 114995, at *32-*33 (S.D.N.Y. Aug. 15, 2008) (quoting *Schisler v. Bowen*, 851 F.2d 43, 46 (2d Cir. 1988)). A treating physician's opinion regarding the nature and severity of a claimant's impairments, therefore, must be given "controlling weight" so long as the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record . . . ."

---

[41] The Commissioner "give[s] more weight to medical opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(c)(2).

*Bradley v. Colvin*, 110 F. Supp. 3d 429, 442 (E.D.N.Y. 2015). A doctor who has only seen a patient once or twice is not considered a treating physician. *See Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) ("[A] physician who only examined a claimant 'once or twice' did not see that claimant regularly and did not develop a physician/patient relationship with the claimant," and therefore "such a physician's opinion [is] not entitled to the extra weight of that of a treating physician." (internal quotation marks omitted)); *see e.g.*, *Lasitter v. Astrue*, No. 12-CV-112, 2013 WL 364513, 2013 U.S. Dist. LEXIS 12262, at *17 (D. Vt. Jan. 30, 2013) (finding a doctor who only treated the plaintiff on one or two occasions "did not have an ongoing treatment relationship with her and was not a 'treating physician' for purposes of the treating physician rule").

Where Dr. Krinick treated plaintiff only once, the ALJ erred in referring to Dr. Krinick as one of plaintiff's "treating" physicians and evaluating his opinion under the treating physician rule. (333-34.) In any event, the ALJ's findings were consistent with those of Dr. Krinick. Dr. Krinick diagnosed plaintiff with a medial meniscus tear and traumatic arthropathy in her right knee. (143.) In conducting the RFC assessment, moreover, the ALJ relied principally on the opinions of Drs. Eliav and Calvino, not Dr. Krinick. (334.) Thus, the ALJ's error does not warrant remand. *See e.g.*, *Lacy v. Astrue*,

No. 11-CV-4600, 2013 WL 1092145, at *14 (E.D.N.Y. Mar. 15, 2013)

("Since Dr. Haddad, Dr. Chernoff, and Dr. Dynoff each only saw

Plaintiff once or twice following her car accident, the Court

finds that they were not 'treating physicians' for the purpose

of the treating physician rule. In any event, the ALJ's findings

were consistent with the medical records of Dr. Haddad, Dr.

Chernoff, and Dr. Dynoff").

### 3. The ALJ's RFC Assessment is Not Supported by Substantial Evidence

The ALJ determined that plaintiff could perform a

substantial range of light work under 20 C.F.R. § 416.967(b)[42],

in part because she could "lift and carry 10 pounds frequently

and 20 pounds occasionally . . . ." (325.) The record, however,

is missing medical evidence indicating how much plaintiff can

lift or carry. The objective medical record establishes that

---

[42] Under 20 C.F.R. § 416.967(b), "light work" is "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."

"Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 416.967(a).

plaintiff cannot lift or carry heavy items. Her treating physicians have continually determined that the pain caused by the radiculopathy and stenosis in her cervical and lumbar spine, and joint effusion in her right knee, prevent her from engaging in heavy lifting. On July 23, 2007, Dr. Lifschutz opined that plaintiff should not engage in "heavy or repetitive" lifting. (242.) The ALJ properly found that this portion of Dr. Lifschutz's opinion was supported by the medical evidence. (333.) And on February 10, March 17, and May 11, 2014, Drs. Hu and Quach, also instructed plaintiff to avoid "aggravating", "strenuous", and "high impact" activities.[43] (1394, 1402, 1410, 330.) But these opinions do not specify how much weight and how frequently plaintiff can lift or carry.

The only evidence of how much plaintiff can lift or carry are her statements. As the ALJ noted, she has stated that has trouble pushing a cart or carrying a basket at the grocery store because it creates pain and pressure on her back and neck, and that she cannot lift a gallon of milk or water with ease for the same reason. (331-32.) A gallon weighs approximately eight pounds[44], which means the most that plaintiff can lift is eight pounds.

---

[43] After a one-time examination of plaintiff on November 7, 2013, Dr. Kim also instructed plaintiff to avoid such activities. (1410.)

[44] *How much. Does one gallon of water weigh?*, Study.com, https://study.com/academy/answer/how-much-does-one-gallon-of-water-weigh.html (last visited June 24, 2018).

Without "medical signs or laboratory findings[,]" the SSA regulations require that the ALJ opine that her symptoms of pain do not "affect [her] ability to do basic work activities . . . ." 20 C.F.R. § 416.929(b). The ALJ must consider subjective evidence of pain or disability testified to by the claimant, but only to "the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(a). And, as the ALJ has correctly noted in his decision (330, 332), the record is replete with treatment notes from doctors that plaintiff's motor strength in her upper extremities was 5/5, she had full ROM in her upper extremities, and reported feeling no weakness even when she presented to the ER or complained to her treating physicians of numbness and tingling in her arms. (195, 213, 537, 648, 651, 663, 678, 983, 634, 640, 651, 652, 663, 1015, 1050, 1018, 1080, 1265, 1266, 1306, 1323, 1360, 1399, 1405, 1427.) The ALJ also correctly highlighted that, despite plaintiff's repeated visits to the ER, she was usually not admitted. (333.) The ALJ further noted that "the record does not reflect significant treatment . . . ." (332.) Moreover, on July 19, 2010, December 21, 2010, and June 14, 2011, plaintiff reported during doctor visits that she was currently a student at LaGuardia Community College (608, 628, 647), a fact that she did not mention during any of her testimony at ALJ hearings and

belies her statements of difficulty with movement.

But the record still does not clarify the amount of weight that plaintiff can lift or carry. Moreover, the ALJ did not mention that on June 14, 2011, when she presented to Dr. Gasalberti with numbness and tingling in her left hand, although the doctor found functional ROM in her upper extremities, he also found Tinel's in both her wrists. (651.) On May 22, 2014, Dr. Hu ordered an EMG in part because of carpal tunnel. (1328.) It is unclear if Tinel's or carpal tunnel would impact how much plaintiff can lift or carry, in part because these treating physicians did not conduct complete impairments assessments of plaintiff.

The ALJ only sought a complete impairments assessment from the medical expert, Dr. Eliav, whose opinion is also not fully supported by the record evidence (*see infra*). None of plaintiff's treating physicians provided or were asked to provide a complete impairments assessment. Such an assessment, particularly from Dr. Gasalberti who treated plaintiff between 2011 and 2013 (647, 651, 665-7, 1421-25), and Drs. Hu and Sung who treated plaintiff between 2013 and 2014 (1357, 1359-60, 1367-69, 1371-73, 1392-94, 1398-1402, 1426), would assist in supporting the ALJ's RFC assessment of how much plaintiff can lift or carry. The ALJ may also consider asking Dr. Lifschutz, who treated plaintiff between 2006 and 2007, for a complete

impairments assessment and why he opined that plaintiff was disabled.

The ALJ's RFC assessment that plaintiff's hourly breaks should be five minutes, (325), also appears to be arbitrary given that the vocational expert testified that a six-minute break would exclude plaintiff from the jobs that are available to someone with plaintiff's profile. (415.) Again, other than plaintiff's own statements, there is no evidence of how long plaintiff needs to break between sitting, standing, or walking. She has stated that lying down alleviates the pain that arises from activity (537, 1329, 1426), but has not said for how long. During the July 10, 2014 hearing, she testified that "I went from sitting to standing to lying down outside. And that's pretty much what happens to me within an hour of the activities." (346.) She also stood up twice during that approximately 70-minute long hearing, but there is no record of how long she remained standing. (350, 363.) During the 31-minute hearing on October 2, 2014, there is no record of her standing up. An impairments questionnaire from her treating physicians would also assist the ALJ's RFC assessment. Thus, remand is warranted.

### 4.    The ALJ Erred in Placing Great Weight on Dr. Eliav's Expert Testimony

The ALJ placed "[g]reat weight" on the expert

testimony of Dr. Eliav because he has the relevant expertise, "is familiar with the disability guidelines, reviewed all of the medical evidence, and heard the claimant's testimony, and whose opinions are consistent with the medical evidence as a whole." (333.) The ALJ adopted Dr. Eliav's impairments assessment of plaintiff. (331, 333.) Dr. Eliav is a medical expert in the field of physical medicine and rehabilitation. (360, 493.) An ALJ may ask for and consider opinions from medical experts on the nature and severity of an individual's impairment. 20 C.F.R. § 404.1527(a)(1), b. Medical experts are highly qualified professionals who are experts in the evaluation of medical issues in disability claims under the Act, and their opinion may constitute substantial evidence in support of a denial of benefits, where the opinion is supported by the evidence of record. *See Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995); *Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993).

Dr. Eliav failed to explain the basis for his impairments assessment of plaintiff. He elaborated only by testifying that the record does not support plaintiff's complaints of limitations in using either arm, specifically that numbness leads to her inability to fully use either arm. (391.) Also, after testifying that he had reviewed the record (360), the doctor testified that he could not opine with certainty unless he could see the actual test results, rather than rely on

doctors' notes summarizing the results. (370-71.) Yet, such results were already in the record. Consequently, the Court does not know how the ALJ determined that Dr. Eliav had reviewed all of the relevant evidence or what weight to accord to Dr. Eliav's opinion.

Moreover, since Dr. Eliav did not examine plaintiff, his opinion must be supported entirely by the record. But Dr. Eliav's opinion that plaintiff can lift up to ten pounds frequently and 20 pounds occasionally, and needs a five-minute break every hour that she stand, walks, or sits (401-02, 403), is not supported by the record for the same reasons that those portions of the ALJ's RFC assessment are not supported by the record. Thus, the ALJ erred in according "[g]reat weight" to Dr. Eliav's opinion. *See e.g.*, *Mendez v. Berryhill*, No. 16-CV-350, 2018 U.S. Dist. LEXIS 59187, at *67-*71 (E.D.N.Y. Mar. 30, 2018)(ruling that the ALJ erred in according "great weight" to the medical expert's testimony where the expert failed to show a grasp of the SSA regulations, opined in contravention to the evidence, and whose opinion was not supported by the evidence).

### 5. The Records That Were Not Before the ALJ on Remand

Defendant's moving memorandum raises the issue that on remand, neither side submitted to the ALJ the medical records that plaintiff filed in the 2011 Litigation. (ECF No. 18, Memo. of Law in Supp. of the Def.'s Mot. for J. on the Pleadings, at

44-49.) Defendant further notes that much of this record is duplicative of the records in front of the ALJ at the remand hearings, and the records that were not duplicative are cumulative (a handful of treatment notes and referrals for physical therapy). (*Id.* at 52-56.)

Plaintiff has not addressed these records, either during the remand hearings in July and October 2014, or in opposing defendant's motion. Although plaintiff is litigating this case *pro se*, she was represented by counsel in the 2011 Litigation and the 2014 remand hearings. Therefore, plaintiff had ample opportunity to address these records. Consequently, the Court need not address whether the records are cumulative of the evidence already presented to the ALJ, or whether they are material or would have changed the ALJ's finding of not disabled.[45] Nonetheless, because the amount of non-duplicative

---

[45] Under § 405(g), "the court may, . . . remand the case to the Commissioner of Social Security . . . , and it may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . ." 42 U.S.C. § 405(g). Thus, an appellant must show that the proffered evidence is (1) "'new' and not merely cumulative of what is already in the record," and that it is (2) material, that is, both relevant to the claimant's condition during the time period for which benefits were denied and probative. *Szubak v. Secretary of Health & Human Servs.*, 745 F.2d 831, 833 (3d Cir. 1984), The concept of materiality requires, in addition, a reasonable possibility that the new evidence would have influenced the Secretary to decide claimant's application differently. *See id.* at 833; *Chaney v. Schweiker*, 659 F.2d 676, 679 (5th Cir. 1981). Finally, claimant must show good cause for her failure to present the evidence earlier. *See Tolany v. Heckler*, 756 F.2d 268, 272 (2d Cir. 1985) (good cause shown where new diagnosis was based on recent neurological evaluation and assessment of response to medication required observation period); *Tirado v. Bowen*, 842 F.2d 595, 597 (2d Cir. 1988).

materials is relatively small, on remand, the plaintiff may

present them to the ALJ for review and consideration.

**6.    The ALJ erred in not Ruling on Plaintiff's
       DIB Application**

On July 25, 2007, Plaintiff applied for both SSI and

DIB (78-89), but neither the 2009 nor the 2014 ALJ opinions

ruled on plaintiff's application for DIB. (12-18, 48-51, 322-

35.) On remand, the ALJ should address plaintiff's application

for both SSI and DIB.

## **CONCLUSION**

For the reasons set forth above, the plaintiff's and the defendant's motions for judgment on the pleadings are DENIED and the case is REMANDED under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Memorandum and Order. The Clerk of Court is respectfully directed to send a copy of this Memorandum and Order to the *pro se* plaintiff, and note service on the docket, no later than October 17, 2018. The Clerk of Court is directed to close this case.

SO ORDERED.

Dated:    October 15, 2018
Brooklyn, New York

_____/s/_____
KIYO A. MATSUMOTO
United States District Judge
Eastern District of New York